THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY V. LAURA WHEELER *et al., as Heirs, etc.*

No. 16,025.

### SYLLABUS BY THE COURT.

1. RAILROADS—*Railway-crossing—Notice of Danger.* The law regards a railway-crossing as a place of danger, and a view of a railway track as a warning of danger to an approaching traveler.

2. —— *Injury to Stock at a Crossing—Contributory Negligence.* One who drives a herd of cattle along a highway for a distance of eighty-seven rods, and upon a railway-crossing with which he is familiar, without taking any precautions to ascertain whether there is a train in dangerous proximity, is guilty of contributory negligence which will bar a recovery for cattle killed in a collision which might have been avoided by the exercise of care proportionate with the perils of the situation.

3. —— *Same.* The fact that there were obstructions which obscured the view of the railway track in one direction made it the duty of the driver to take other reasonable precautions to ascertain whether there was a train approaching before permitting the cattle to go upon the crossing, and under the circumstances of the case it is *held*, that the driver in question failed to exercise due care for the protection of the cattle.

Error from Clay district court; SAM KIMBLE, judge. Opinion filed May 8, 1909. Reversed.

### STATEMENT.

THIS action was begun by Mitchell Wheeler to recover from the Chicago, Rock Island & Pacific Railway Company for four head of cattle killed at a railway-crossing. At the first trial the plaintiff obtained a

judgment against the railway company, which was reversed because of the erroneous admission of evidence and the submission to the jury of questions not embraced within the pleadings. (*Railway Co. v. Wheeler*, 70 Kan. 755.) In the second trial the jury found upon evidence that the whistle on defendant's locomotive was not sounded eighty rods from the crossing, as the law requires, and that, if it had been, Morissette, plaintiffs' employee, who was driving the cattle, could have heard it in time to prevent the cattle from going on the track. On the kind of care exercised by Morissette, before and at the time of the collision, the following answers to special questions which are deemed to be material were returned, although not given in the order in which they appear in the record:

"(15) Ques. How far south of the crossing where the cattle were killed, on the highway between sections 9 and 10, could a train be observed approaching said crossing from the southeast for a distance of two or three miles? Ans. Seventy-five yards."

"(5) Q. How far south of the crossing where the collision occurred was Morissette when he first saw the train which struck the cattle approach? A. Seventy-five or one hundred yards."

"(16) Q. How far south of the crossing where the collision occurred was Mr. Morissette when he first looked to the southeast for a train? A. Seventy-five or one hundred yards.

"(17) Q. What did Mr. Morissette do, if anything, in looking for a train when he reached a point on said north-and-south highway where a train could be seen approaching from the southeast, to ascertain whether or not such train was coming? A. Looked back from the southwest corner of section 10."

"(21) Q. Under the conditions as to light or darkness existing at the time and place in question, for what distance to the southeast could a train be seen approaching the crossing where the cattle were killed by a traveler on the north-and-south highway between sections 9 and 10 after he had reached a point north of the buildings at the southwest corner of said section 10 where his view was unobstructed? A. One-half mile."

"(6) Q. How far from the crossing where the train

struck the cattle was the train when Mr. Morissette first observed it?  A.  Forty rods."

"(30)  Q.  About what distance were the leaders of the herd of cattle ahead of Mr. Morissette, the driver, as they approached the crossing where the injury occurred?  A.  Seventy-five or one hundred yards.

"(31)  Q.  Were the cattle driven by. the witness, Morissette, as they approached the crossing, driven in a string along the road?  A.  Yes.

"(32)  Q.  If your answer to the last question is 'Yes,' state about how long the string of cattle was as they approached the crossing where the cattle were killed.  A.  Seventy-five or one hundred yards."

"(18)  Q.  As Mr. Morissette approached the crossing in question on the north-and-south highway between sections 9 and 10, did he at any time stop, look and listen for an approaching train from the southeast?  A.  No."

"(4)  Q.  Is it not a fact that ten, fifteen or twenty of the cattle which Mr. Morissette was driving at the time of the collision had passed over the defendant's railway track at the crossing where the accident in question occurred before Mr. Morissette made any effort to ascertain the approach of the train which struck the cattle?  A.  Yes."

"(9)  Q.  How did Mr. Morissette get from the place where he was when he first observed the train up to the crossing where the cattle were struck?  A.  Rode part way and balance on foot.

"(10)  Q.  What did Mr. Morissette do after he arrived at the crossing in the way of getting the cattle off the track?  A.  Made an effort to keep them back."

"(26)  Q.  As the train in question approached the crossing where the collision occurred, did the plaintiff's agent, Morissette, cause the cattle in question to be divided, a part on the north side and a part on the south side of the track in question?  A.  Yes."

"(33)  Q.  Did Mr. Morissette see the approaching train as soon as it reached the railroad-crossing over the wagon-road running east and west along the south side of section 10?  A.  He did not.

"(34)  Q.  Did Mr. Morissette see the approaching train when it was as far as eighty rods southeast of the place where the cattle were struck?  A.  He did not."

In connection with the special findings the jury returned a general verdict for $180.75, from which the plaintiffs offered to remit $2. Error is assigned on the refusal of the court to direct a verdict in favor of the railway company, and to render a judgment in favor of the company on the special findings returned by the jury.

*M. A. Low,* and *Paul E. Walker,* for the plaintiff in error.

*F. B. Dawes,* and *R. C. Miller,* for the defendants in error.

The opinion of the court was delivered by

JOHNSTON, C. J.: The defendant's railway cuts off the southwest corner of a section of land near Morganville and runs diagonally from the southeast to the northwest, intersecting highways on the south and the west sides of the section. The south crossing is forty-seven rods east of the southwest corner of the section, and the west crossing, where the cattle were killed, is eighty-seven rods north of the southwest corner of the section. Morissette, who had charge of the cattle, had driven them over these highways twice each day for more than two months before the collision. On the evening of the collision he drove the herd, 112 in number, from the pasture on the east along the highway on the south side of the section, and when near the south crossing he rode ahead of the herd to see if a train was approaching, and finding none he drove the cattle over. When he reached the southwest corner of the section and started north along the west highway he again looked to the south for a coming train, but saw none. He was then eighty-seven rods from the west crossing. From that point there were buildings and trees on his right which obscured the view of a train coming from the southeast until he had reached a point seventy-five to one hundred yards from the west cross-

ing. From the time he turned the corner and started north he allowed the cattle to string out along the road and a number of them to go on and over the crossing without taking any precautions to ascertain the approach of a train from the southeast. When he passed the obstruction, which was about 300 feet from the crossing, he saw the coming train and endeavored to avert the danger, but it was too late, as the cattle were already on the track.

The findings of the jury affirmatively show that he did not exercise ordinary prudence in caring for the cattle, and that the collision was the result of his concurring negligence. The railway company was found to be negligent in failing to give the necessary signals on approaching the crossing where the cattle were killed. The negligence of the company, however, did not relieve Morissette from the exercise of reasonable care for the cattle which he was driving. The law regards a railway-crossing as a place of danger, and a view of the track itself as a warning of danger to an approaching traveler. (*U. P. Rly. Co. v. Adams*, 33 Kan. 427.) In many cases it has been held that a traveler who approaches a railway-crossing with which he is familiar without looking or listening for approaching trains or using reasonable care to ascertain whether there is a present danger in crossing is guilty of contributory negligence which will bar recovery for injuries sustained in a collision. It is not enough for a traveler to look where an approaching train can not be seen or to listen when it can not be heard. Nor will it suffice that one has looked some distance away from the crossing when a view on a closer approach would have revealed the danger. (*Railroad Co. v. Holland*, 60 Kan. 209; *Railroad Co. v. Entsminger*, 76 Kan. 746.) Where by reason of obstructions or noises an approaching traveler can not see or hear a coming train, it may be necessary for him to stop or take some other suitable precaution to ascertain whether there is a train in dangerous

proximity. (*A. T. & S. F. Rld. Co. v. Hague*, 54 Kan. 284.) In short, he must exercise care proportionate to the perils of the place.

Now, Morissette had had experience in handling cattle, and he was very familiar with the crossing in question. He allowed the cattle to travel from the corner of the section and on and over the crossing, a distance of eighty-seven rods, without taking any care whatever for their safety at the crossing. He did not look or listen for a train until he was within seventy-five to one hundred yards of the crossing, and at that time the cattle were already going over the track. It is true that he was unable to get a view of the track to the south until he reached that point, but that being true he should have taken other reasonable precautions to learn whether a train was in dangerous proximity. It would have been easy for him to ride ahead of the herd and ascertain whether there was a coming train, and that would have been no more than ordinary care. His action at the south crossing indicated that he appreciated the danger of taking cattle over such crossings and knew a prudent method of averting it. There, as we have seen, he rode forward and looked down the track for a train before allowing the cattle to cross, and if he had taken the same precaution at the west crossing the collision and loss might have been avoided. If in driving the cattle they had been grouped more closely, so that the leaders were only a short distance ahead of him, or if he had been driving but a single animal, there might have been some excuse for failing to exercise any care to ascertain if a train was coming until he had passed the obstruction. But to drive them along blindly for eighty-seven rods and allow them to string out and over the crossing without taking any precautions for their protection at such a dangerous place was a plain case of contributory negligence.

In *Railway Co. v. Jenkins*, 74 Kan. 487, a man standing in the rear of his wagon passed an obstruction

which cut off his view of a railway track, and his team was struck and injured by a train which he failed to see but which might have been seen if he had taken care commensurate with the perils of the situation.   In deciding the case it was said:

"Ordinary care further requires that a man driving a team across a railroad track or a series of railroad tracks shall not deprive himself of the opportunity of a prompt view by unnecesarily lagging behind while the team proceeds unguarded into danger.   He must be vigilant in trying to see."   (Page 488.)

So here it may be said that the inattention of Morissette while the cattle went unguarded into danger was not ordinary care.   It is true, as contended by plaintiffs, that it is ordinarily a question of fact for the jury to determine whether a traveler has looked frequently enough or whether he looked or listened at the right spot before going on a crossing, but here the facts showing contributory negligence have been specifically found.   The cattle, as we have seen, were permitted to travel more than a quarter of a mile and over the track without Morissette's having made any use of his senses to avoid danger or taking any precaution for the safety of the cattle.

On the findings it must be held that there was such contributory negligence as precludes a recovery, and hence the judgment is reversed and the cause remanded, with directions to enter judgment on the special findings of the jury in favor of the railway company.