WINSTANLEY, Administrator, etc., Respondent, vs. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY COMPANY, Appellant.

*September 22 — October 9, 1888.*

*Railroads: Crossing of private way: Duty to erect warning sign and to sound whistle: Unlawful speed: Proximate cause of accident: Contributory negligence: Court and jury: Evidence: Credibility of witnesses.*

1. It may be negligence for a railroad company not to sound the whistle of a locomotive before it crosses a private way in a city, or not to place at the crossing of such way a sign with the warning, "Look out for the cars," although there is no express provision of law requiring those things to be done in such a place.

2. Plaintiff's intestate was killed at the crossing of a private way and a spur track of the defendant's railroad in a city. His team had been standing about twenty-six feet west of the track, when he got into the wagon and drove on a walk towards the crossing. Nearly the whole track to the south for a long distance was hidden by buildings until the team came within about four feet of the western rail, when he could have seen a car if it had been within thirty feet of the crossing. When the heads of the horses were over the western rail, but before their feet had reached it, the northwest corner of a car being pushed from the south caught the collar of the off horse, turning the team suddenly to the left, and the intestate was thrown out under the car and killed. It was a cold morning and the wind was blowing strongly towards the

south. Empty cars were pushed northward over that crossing at about that time every morning, but it is uncertain whether or not the deceased knew that fact; and the evidence was conflicting as to whether he was warned, just before starting, that the train was coming. The evidence tended to show that there was no sign near the crossing with the warning, "Look out for the cars;" that no bell was rung or whistle blown on the locomotive; and that the train was running at the rate of eight miles per hour, the lawful rate being six. *Held:*

(1) There was no error in admitting evidence of the absence of the warning sign, or in refusing to instruct the jury that the railroad company was under no obligation to sound a whistle for the crossing.

(2) Nor was it error for the court to refuse to instruct the jury that the speed of the train was not the proximate cause of the accident.

(3) The question of the contributory negligence of the deceased was properly left to the jury. *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216, distinguished.

3. A witness, M., testified that he told the deceased, as he was starting, that the train was coming, and that he replied, "I can make it." Several other witnesses, who were present and would have seen M. had he been there to say this to the deceased, testified that they did not see him, and that they remained there all the time from the arrival of the deceased to his death. *Held,* that this court cannot say, as a matter of law, that the jury were bound to believe the testimony of M. as against the other testimony.

APPEAL from the Circuit Court for *Winnebago* County. The action was brought by *John Winstanley*, as administrator of the estate of Robert Winstanley, deceased, to recover damages for the death of his intestate, alleged to have been caused by the negligence of the defendant's employees. The plaintiff had a verdict for $1,500, and from the judgment thereon the defendant appealed. The facts are stated in the opinion.

For the appellant there was a brief by *John T. Fish*, attorney, and *Burton Hanson*, of counsel, and oral argument by *Mr. Hanson*. They contended, *inter alia*, that the undisputed evidence showed that the deceased was guilty of

negligence. Even if the witness Martin did not warn him as he says he did, that the train was coming near at hand, the deceased was still bound to do what was needful to ascertain whether it was safe for him to cross the track before driving his team dangerously near to it. *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216; *Salter v. U. & B. R. R. Co.* 75 N. Y. 273; *Gorton v. E. R. Co.* 45 id. 660; *Mantel v. C., M. & St. P. R. Co.* 33 Minn. 62; *Union P. R. Co. v. Adams,* 19 Am. & Eng. R. Cas. 376; *Haas v. G. R. & I. R. Co.* 47 Mich. 401; *Griffin v. C., R. I. & P. R. Co.* 68 Iowa, 638.

For the respondent there was a brief by *Weisbrod, Harshaw & Nevitt,* attorneys, and *Gabe Bouck,* of counsel, and oral argument by *Gabe Bouck* and *A. W. Weisbrod.* They argued, among other things, that the deceased, being lawfully on the premises, had a right to rely upon the performance by those on the locomotive not only of every act imposed by law upon them when approaching a crossing, but also that they would at least use ordinary care in the management of the train. See cases cited in appellant's brief in *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 219; *Strong v. Placerville R. Co.* 8 Am. & Eng. R. Cas. 273; *Ditberner v. C., M. & St. P. R. Co.* 47 Wis. 138. It cannot be held, as a matter of law, that it was the duty of the deceased to have gone forward to see if a train was approaching, but this, in connection with the surrounding circumstances, at most, was a question of fact for the jury. *Duffy v. C. & N. W. R. Co.* 32 Wis. 269; *Urbanek v. C., M. & St. P. R. Co.* 47 id. 59; *Eilert v. G. B. & M. R. Co.* 48 id. 606; *Dolan v. D. & H. Canal Co.* 71 N. Y. 285; *Strong v. Placerville R. Co.* 8 Am. & Eng. R. Cas. 273; *Guggenheim v. L. S. & M. S. R. Co.* 57 Mich. 488; *Roberts v. C. & N. W. R. Co.* 35 Wis. 679; *Petty v. H. & St. J. R. Co.* 28 Am. & Eng. R. Cas. 618. The fact that a person attempting to cross a railroad does not at the instant of, or immediately before, stepping on the track

look or ascertain if a train is coming, is not conclusive evidence of a want of care on his part. His omission to do so should be submitted to the jury. *Plummer v. Eastern R. Co.* 73 Me. 591, 6 Am. & Eng. R. Cas. 165; *Ind. & V. R. Co. v. McLin,* 8 Am. & Eng. R. Cas. 237; *Chaffee v. B. & L. R. Corp.* 104 Mass. 108; *Sherry v. N. Y. C. & H. R. R. Co.* 104 N. Y. 652; *Greany v. L. I. R. Co.* 101 id. 419; *Nosler v. C., B. & Q. R. Co.* 73 Iowa, 268. In the following cases, similar to the one at bar, it was held not to be error to submit the question of contributory negligence to the jury. *Pittsburg, C. & St. L. R. Co. v. Martin,* 8 Am. & Eng. R. Cas. 253; *Hutchinson v. St. P., M. & M. R. Co.* 19 id. 280; *Klanowski v. G. T. R. Co.* 21 id. 648; *Loucks v. C., M. & St. P. R. Co.* 31 Minn. 526; *Tyler v. N. Y. & N. E. R. Co.* 137 Mass. 238; *Kellogg v. N. Y. C. & H. R. R. Co.* 79 N. Y. 72; *Petty v. H. & St. J. R. Co.* 28 Am. & Eng. R. Cas. 618. See, also, *Ferguson v. W. C. R. Co.* 63 Wis. 145; *Bonnell v. D., L. & W. R. Co.* 39 N. J. Law, 189; *Sonier v. B. & A. R. Co.* 141 Mass. 10. In the absence of evidence to the contrary the presumption is that a person looked and listened. *Schum v. Penn. R. Co.* 107 Pa. St. 8.

ORTON, J. This action is to recover damages which the respondent sustained by the death of his son Robert, which was caused by the negligence of the appellant company, and the plaintiff recovered $1,500. The main facts were as follows: The railroad runs nearly north and south through that part of the city of Oshkosh, and there is a side or spur track which runs in the same direction, quite a long distance by, and to accommodate, several mills and manufacturing establishments. On the west side of said track there is a large building used for a glazing-shop, 120 feet long and 50 feet wide, with a platform running along the east side, six feet and four inches wide, and within two feet and eight inches of the west rail of the spur track.

There is also a platform of about the same width along the north end of said glazing-shop, and a door into the shop about the middle of the building, and steps at each end of this platform. Immediately in front of this platform there is, and has been for a long time, a road or private way from a mill some distance west, across the spur track, and on towards High street east, and the crossing is built a little north of the platform and very near the northeast corner of the glazing-shop. The spur track is used for hauling loaded cars south about 7 o'clock in the morning, and running empty cars back over. this road crossing about 8 o'clock daily, with no more irregularity than may be caused by a longer time to unload the cars at some times that at others. It was about 8 o'clock when this death occurred, and an engine was pushing several empty box cars on the track towards the north. The deceased, a boy about eighteen years of age, had been working with his father's team for one Martin, hauling loads from said mill west of the crossing, and on this morning, with another workman, had been to the mill for such purpose, and, not finding Martin, had returned and left his team standing about six feet from the north platform, and went into the glazing-shop to warm himself, and he and the other workman came out and got into his wagon, and drove towards the road crossing, about twenty-six feet distant, and on a walk, as the witnesses for the plaintiff testified. When his team came within about four feet of the rail at the crossing the deceased, from where he was sitting in his wagon, could have seen for the first time the north end of the first box car, if it had been within probably about thirty feet south of the crossing. Before reaching that point, nearly the whole. track south for a long distance was hidden from his view by the glazing-shop and other buildings. When the team, with their heads probably turned a little to the left, had come nearly to the west rail of the track, with their heads

a little beyond it, the northwest corner of the first box car came in contact with the collar of the off horse and caught behind it, and as it passed on wheeled the team around to the left, and pulled them along outside of the track about two rods, where the car became disengaged from the collar, and went on, and the horses stopped. When the team was thus suddenly turned about to the left, the deceased, either by the tilting of the wagon-box, or by the sudden stopping or turning of the wagon, or in some other way, was thrown forward under the car, and killed. From the manner in which the corner of the car caught the collar of the horse, the horse's head was probably turned somewhat towards the left. The corner of a car is some distance over and outside the rail of the track, and the forward feet of horses are about even with or a little behind the collar, and therefore the horses' feet had not yet come to the first rail of the track, although their heads may have been over it. The team cannot be said to have come onto the track, or to have hardly come up to the track. The wind was blowing strongly towards the south. The testimony on behalf of the plaintiff tended to show that no bell was rung or whistle blown on the train; that the train was running at the unlawful rate of speed of eight miles an hour; and that there was no sign near the crossing with the warning on it of "Look out for the cars," — and the jury were warranted in finding that such were the facts.

The second and fifth errors relied upon by the learned counsel of the appellant are that "the court erred in refusing to instruct the jury that the appellant was under no obligation to sound a whistle for the crossing," and in "overruling the appellant's objection to the following question: "Was there any sign up at the crossing of the road over this track in question?" "Was there a sign, 'Look out for the cars?'" These alleged errors may be disposed of together, as being within the same reason and resting upon

the same general ground. The contention is that the law does not require the whistle to be blown or such a sign to be put up as an absolute duty, and therefore the negligence of the appellant cannot be predicated on its failure to do so. It may be true that there is no express provision of law requiring these things to be done in such a place, yet it may be a question for the jury whether such precautions ought not to have been taken at such a very dangerous crossing, like the duty of the company to keep a flag-man at certain crossings where the statute does not require it, but where there is an extraordinary liability of collision with those passing over them, as in *Guggenheim v. L. S. & M. S. R. Co.* 32 Am. & Eng. R. Cas. 89, 33 N. W. Rep. (Mich.), 161, and in *Hoye v. C. & N. W. R. Co.* 67 Wis. 1, and like the duty to blow the whistle, as in *Roberts v. C. & N. W. R. Co.* 35 Wis. 679.

The third error relied on is " the refusal of the court to instruct the jury that the speed of the train was not the proximate cause of the accident." Why was the speed of the train, at the rate of two miles an hour faster than the law allowed, not the proximate cause of the accident, when, if it had not been for this excess of speed, the train would not have been near the crossing when the deceased attempted to pass over it, and the deceased would have passed over it with safety before the train would have arrived there at the lawful speed of six miles an hour? There could scarcely be a cause more proximate to the accident. If the deceased did not contribute to cause his own death by his culpable negligence it might be said that he was killed by this excess of speed. It was negligence in law to run that train more than six miles an hour in such a place, and this fault of the company cannot be extenuated by any view of the case.

The fourth error complained of is the refusal of the court to give the eighth and ninth instructions asked by the ap-

pellant. Such instructions were that, "if you find that the deceased, Robert Winstanley, had he looked when his team was from four to six feet from the rail of the track, could have seen the approach of the cars in time to have stopped his team, and if you find that the deceased was notified of the approach of the train just before he started his team, then, in either case, your verdict must be for the defendant." It is extremely doubtful whether, in any case, these instructions ought to be given, and much more so in this, where there are or might be so many circumstances which might prevent the person killed or injured from availing himself of the advantage of such looking and knowing, such as the inability to control his team, and other intervening causes. Such instructions make negligence in the law, and absolute, when it depends altogether upon a variety of facts and circumstances which ought to be considered by the jury. An instruction in substance like the said eighth instruction asked was held to have been properly refused in *Shaw v. Jewett*, 86 N. Y. 616, and the court said: "This is not the rule. The plaintiff is not bound to see. He is bound to make all reasonable effort to see, that a careful, prudent, man would make in like circumstances." But the court, in its general instructions to the jury, which were unusually full, fair, able, and impartial, gave these very instructions in substance, and the appellant, at least, has no reason to complain.

The only remaining error complained of is the refusal of the court to direct the jury to render a verdict for the defendant. This brings us to a consideration of the facts and the merits of the case. The main reasons given why the court should have taken this case from the jury, and directed a verdict, are (1) that the deceased, when his team was about four feet from the rail of the track, could have seen, had he looked in that direction, the approaching train in time to have stopped his team; and he did not look, or he

would have stopped his team before they got so near the track; (2) that the deceased had for over a year previously been engaged in driving a team over this private road and crossing, and must have known that this train was due at the crossing about this time; and (3) that the witness Martin saw the deceased while he was standing on the north platform of the glazing-shop before he got into his wagon, and told him that the train was coming, and that he replied, "I can make it."

That a person approaching a railroad crossing should look and listen, if looking and listening would do him any good in protecting him from injury, before attempting to cross over, has been as persistently insisted upon by this court as by any court in this country or in England. It is not common care and prudence for such a person to drive on heedlessly, without taking such reasonable and natural precautions to secure his safety. If, for a considerable distance from the crossing, his view towards an approaching train is cut off by buildings, embankments, or other obstructions, greater caution should be used, by listening or by doing other things which a reasonably prudent man would· be likely to do, in order to ascertain whether a train was so near the crossing as to make dangerous or hazardous his attempt to cross over in front of it. What such other things are must be determined by the facts of that particular case, and they cannot be classified by any general rule. If the view of such a person is cut off until he is near the crossing, and he could then, by looking, see the danger in time to stop or in any way avoid a collision with the train, he should do so, and as a general rule it would be such a want of common care and prudence as to preclude his recovery of damages resulting from such a cause if he does not do so. In any case, it would be heedless and reckless to drive or go on without any precautions for his safety. These principles have been urged and made especially em-

phatic, and carried to the utmost extent consistent with reason, in many cases in this court, and especially in the late case — in reference to its own peculiar facts and circumstances — of *Seefeld v. C., M. & St. P. R. Co.* 70 Wis. 216, and nothing could well be added to what is said in the opinion of Mr. Justice Lyon in that case.

The instructions of the court in this case contain a very full and fair, and especially able, exposition of these principles in application to the facts of this case. They go to the extent of almost saying that it was the duty of the deceased to have looked for and seen the approaching train, and to have stopped his team *within that four feet*, and prevented them from going upon the crossing in front of the train. Whether the instructions in this respect were strictly correct we need not decide, for they were very favorable to the appellant, and the company, at least, ought not to complain. The facts of this case are peculiar and essentially different from those of any other case cited by the counsel on either side or found in the books. It was a cold, brisk morning, when men out of doors move quickly, and teams standing in the cold wind are restless, and, when started, move with alacrity and briskness. The wind was blowing violently from the north, towards the approaching train, and whistled around the building. No one of the plaintiff's witnesses about there heard any bell or whistle. The deceased and his fellow-workman jumped into the wagon, headed towards the crossing, only about twenty-six feet away. He drove upon a walk,— probably a fast walk. Had he looked or listened he could not have seen or heard the train until his horses' heads were within about four feet of the rail on the crossing. Had he looked then, *instantly*, he would have seen the front box car within a very few seconds from the crossing. It was almost right upon him. It is quite too strict a duty to have required him to look *instantly*, when he could have first seen the first corner of it,

as it appeared, moving in sight, just past the corner of the building, and here an *instant* counts much. The horses, after that, could take but a step to bring their heads over the track and feet near the rail, where the car caught upon the collar of the nearest horse. The team could scarcely have been said to be *on* the track. They did stop; at least, they did not go further forward. They turned or were turned off to the left, and then for two rods they walked along by the side of the car. The deceased was not killed on the crossing, or by being on the track of the road. He was thrown under the car from some distance away, and from the end or corner of the wagon. The lips of the driver are sealed in death, and we cannot tell what he saw or when he looked, or how the circumstances of this most critical situation and condition of danger appeared to him. He evidently saw his danger, and it would be but natural that he would make every effort to escape it. Did he see the train before his horses' heads were over the track, and while they were within those four feet of the rail? Did he look? Did he stop his team as soon as he could after seeing the train, or try to do so? Who can say? Who knows? We cannot know that he did not try to stop his team, and that he did not look as soon as he could reasonably, after looking would be of any use. The emergency is too great and the danger too sudden for deliberation, and for aught we know he did make every reasonable effort to stop his team in time. His culpable negligence under such circumstances must be clearly shown to defeat this action. Does it clearly appear, or was it clearly shown by the evidence we have? We think not. The peculiar circumstances of this emergency are too much shrouded in doubt and uncertainty to now coolly sit in judgment over the deeds of omission or commission of the unfortunate driver of that team, and determine with any certainty whether he did too little or too much within such narrow limits of time and space.

This is very far from such a case of clear culpable negligence as the court, as a matter of law, would be warranted in so declaring, and no case has been cited of sufficient analogy in its facts to be authority for so holding. On the question of the contributory negligence of the deceased in such a case the verdict of a jury ought to be taken as conclusive. "If the inferences to be drawn from the testimony are doubtful or uncertain, the question of negligence is for the jury." *Seefeld v. C., M. & St. P. R. Co., supra.* In that case "the plaintiff knew and remembered that the train was due and would pass the crossing just about the time he reached it," and many other facts are quite different from the facts of this case. The circuit court did not err in refusing to direct a verdict for the defendant. On the question whether the deceased knew that this train was due at this time, the evidence is not by any means clear and satisfactory. He had been driving a team about there for a year, and perhaps sometimes over this crossing, but whether he had ever noticed the trains on this side or spur track sufficiently to know that they had regular times in the morning of crossing this private way is by no means clear. There is no evidence that he did know this. It is a mere inference, at best, from very remote facts. These trains were not regular, for their time of passing this place depended upon the time required to load or unload the cars before they were run back over this crossing. It might be 8 o'clock, or later. We cannot, therefore, say, as a matter of law, that he did know that this train was due and would pass this crossing at that time.

The court substantially instructed the jury that if they believed the testimony of the witness Martin, that he told the deceased that the cars were coming, and that he replied "I can make it," they must find for the defendant. That instruction was unquestionably correct, for it would establish the fact that the deceased knew the train was near

by, and attempted to beat it over the crossing or to pass over first and take his chances. The jury evidently did not believe this testimony. The question here is, Were they warranted in rejecting it? There was no general impeachment of this witness, but several witnesses, who were present on and about the platform at the time and would have seen Martin had he been there to say this to the deceased, testified that they did not see him, and that they remained there all the time from the arrival of the deceased to his death and would have been likely to have seen him had he been there as he testified. This case was tried in the city where the jury would be likely to know more or less of the witnesses, and they heard Martin and the other witnesses testify, and could better judge of their credibility than this court could from this mere record. The credibility of witnesses is a question peculiarly for the jury, and scarcely ever for the court in jury cases. We do not think we would be justified in deciding, as a matter of law, that the jury were bound to believe the testimony of Martin as against the other testimony.

This case was very ably and thoroughly tried, and the rulings of the court were unusually considerate, judicious, and correct, and the record is free from error.

*By the Court.*— The judgment of the circuit court is affirmed.

See note to this case in 39 N. W. Rep. 856.— REP.