## Petition of DIAMOND COAL & COKE CO.

(District Court, W. D. Pennsylvania. April 19, 1921.)

1. **Shipping ☞209(3)—Burden on corporate barge owner, seeking to limit liability, to prove it came within statutes.**

   A corporate barge owner, seeking to limit its liability to the value of the barges, under Rev. St. § 4283 (Comp. St. § 8021), and section 4289. as amended by Act June 19, 1886, § 4 (Comp. St. § 8027), for the results of the breaking loose of the barges during the rise of a river, had the burden of proving that the damage was occasioned without its privity or knowledge, and that the barges were "vessels used on lakes or rivers or in inland navigation."

2. **Shipping ☞209(3)—Evidence held to show barge owner's negligence in fastening barges, which broke loose, causing damage.**

   In proceedings by corporate barge owner to limit its liability under Rev. St. § 4283 (Comp. St. § 8021), and section 4289, as amended by Act June 19, 1886, § 4 (Comp. St. § 8027), evidence held sufficient to show that the breaking loose of the barges during the rise of a river and consequent damages, were the result of owner's negligence in knowingly leaving the barges tied to small trees.

3. **Evidence ☞13—Common knowledge that roots of locust trees do not extend deep into ground and that they grow rapidly.**

   It is a matter of common knowledge that locust trees are trees whose roots do not extend deep into the ground, but spread practically just underneath it, and that they grow rapidly, and in a comparatively short time will rise from very insecure ground.

4. **Shipping ☞204—Sunken barges held not "vessels used on lakes or rivers or in inland navigation."**

   Sunken barges, which had not been used for a year or two, and were resting on the bottom of a river at the ordinary level of the water, and in

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

need of extensive repairs to make them fit for use, *held* not "vessels used on lakes or rivers or in inland navigation," within Rev. St. § 4283 (Comp. St. § 8021), and section 4289, as amended by Act June 19, 1886, § 4 (Comp. St. § 8027), so as to limit the owner's liability to the value thereof when they broke loose from their fastening during a rise in the river.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Vessel.]

In Admiralty. In the matter of the petition of the Diamond Coal & Coke Company, owner of barges 268, 253, 301, 274, 308, 265, 264, 285, and 269, for limitation of liability. Petition refused.

Decree affirmed in 297 Fed. 246. See, also, 297 Fed. 242.

W. R. Murphy, of Pittsburgh, Pa., for petitioner. ·

ORR, District Judge. This is a proceeding by the Diamond Coal & Coke Company, a corporation organized under the laws of the state of Pennsylvania, to limit its liability for the results of the breaking loose of nine barges during a rise of the Monongahela river on January 2, 1919. The limitation of liability is claimed under section 4283 of the Revised Statutes (Comp. St. § 8021), which reads as follows:

"The liability of the owner of any vessel, for any embezzlement, loss, or destruction, by any person, of any property, goods, or merchandise, shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity, or knowledge of such owner or owners, shall in no case exceed the amount or value of the interest of such owner in such vessel, and her freight then pending,"

—and under section 4289 of the Revised Statutes as amended by the Act of June 19, 1886, 24 Statutes at Large, 80, 81 (Comp. St. 8027), so as to read as follows:

"The provisions of the seven preceding sections, and of section eighteen of an act entitled 'An act to remove certain burdens on the American merchant marine and encourage the American foreign carrying trade, and for other purposes,' approved June twenty-sixth, eighteen hundred and eighty-four, relating to the limitations of the liability of the owners of vessels, shall apply to all sea-going vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters."

At the time the petition was filed, suit had already been brought by the Hazelwood Dock Company against the petitioner to recover damages from the petitioner for the loss, destruction, and injury occasioned to property of the plaintiff by the barges of the petitioner as they were carried down the river. To the petition filed, the Hazelwood Dock Company filed its answer, and as well also did the Iron City Sand Company, a corporation under the laws of Pennsylvania, which had suffered similar injuries to its property from like cause.

[1] The petitioner, having invoked the provisions of law for the purpose of limiting its liability, necessarily has assumed the burden of proving that it comes within such provisions. To be more explicit, the petitioner must satisfy the court, in order that its liability shall not exceed the value of the barges, that the injury by their collision was occasioned "without the privity, or knowledge of such owner," and also that the said barges were "vessels used on lakes or rivers or in inland navigation."

[2] From the large mass of testimony taken in this case it must be found, not only that the plaintiff has not sustained the burden resting upon it to prove either branch of its case, but that it clearly shows that the breaking away of the barges, and their subsequent collision as they moved down stream, occurred as the result of negligence which cannot be said to have been "without the privity or knowledge of such owner," and, further, that said barges had been so withdrawn from navigation that they could not be included in terms "vessels used on lakes or rivers or in inland navigation."

On September 22, 1918, there had accumulated at the Bird's Run dock of the petitioner a large number of barges, too many in fact to enable the petitioner to promptly conduct its business at said dock. In order to have more room at said landing, it was deemed proper by those in charge of said docks to get rid of some of the accumulated barges. Two, at least, were taken into the river, broken up and destroyed. On the date last mentioned, A. R. Budd, the vice president and general manager of the coal company, directed that seven of the barges mentioned above should be taken directly across the river to be tied there. Later, at different times, an eighth and a ninth barge were sent across to the same place and tied with the other barges. The place to which these barges were sent had not been used as a landing for many years, and for years previous to the placing of the barges there the character of the bank had been changed. The change was due to a heavy fill by the Baltimore & Ohio Railroad Company under trestles built by said railroad, intended to support the railroad track resting thereon. When the barges were taken to this place, they were tied up in single file to each other, but not all of them closely to each other, and they were fastened to trees on the bank. The surface of the ground around the trees was not natural ground. The trees to which the lines were attached were small locust trees, around one of which, at least, the accumulated fill was scraped away in order to attach a line near its base. A short distance below the place where these barges were thus tied, on the shore and on the river, was located the property of the Hazelwood Dock Company.

On or about the 1st of November, 1918, the general manager of the Hazelwood Dock Company called the Diamond Coal & Coke Company by telephone, and notified the person in charge of the office at the other end that the barges were not tied up well, and that if they broke loose, and came down, and hit the fleet of the Hazelwood Dock Company, the latter would hold the petitioner responsible for any damage which was done. That telephone message to the general office of the company was communicated to the Bird's Run docks and brought to the attention of those in charge thereof.

On the 1st of January, 1919, the river began to rise, and on the morning of the 2d of January the petitioner sent a steamboat across the river from the Bird's Run docks to attend to the said nine barges. An additional line or two was attached to those which had already been placed there, and tied to similar trees. About 2 o'clock in the afternoon of the 2d of January the barges were lifted from the bottom by the water and floated away, pulling out all the trees to which they

were attached; but one struck a small shanty boat, as it is termed below, then crashed into the Hazelwood Dock Company's fleet, and into the property of the Iron City Sand Company, and caused great loss.

[3] The petitioner attempted to show that the said barges were securely tied by many lines. It is hard sometimes to determine whether vessels have been securely tied after they have floated away. The question more frequently arises where lines have parted. In this case, however, it must be held that the vessels were not securely tied. So far as appears, all the locust trees to which the lines were attached, save one, were pulled out of the ground, and, so far as appears, one line only was broken. It is a matter of common knowledge that locust trees are trees whose roots do not extend deep into the ground, but spread practically just underneath it. It is a matter of common knowledge that locust trees grow rapidly, and that in a comparatively short time many small trees will rise from very insecure ground. One of the trees, which was pulled out as the barges moved away, left a depression in the earth of about 6 feet in diameter and from 18 inches to 2 feet in depth. Above this place, which was selected as a landing, was a pier, which stood at some little distance from the shore, to which the barges could have been securely tied. Capt. Budd and others in charge of the business of the petitioner knew that the barges were not fastened to that pier. They knew that they were fastened to locust trees, and they ought to have known that locust trees of the size described by the witnesses were not suitable to tie to. They were at fault, and when the barges broke away by reason of the insecurity of their fastenings, of which they should have had knowledge, it cannot be said that the injury by collision was without the privity or knowledge of the owner.

This case must be distinguished from those cases where the vessel which caused a loss was far from its home berth, and beyond the observation and immediate control of the principal officers of the corporation which may have owned it. These barges were within sight of the Bird's Run dock at all times during the day, and the knowledge of their situation must clearly be imputed to the managing representatives of the petitioner, especially after they had received the telephonic information that they were not securely tied.

The petitioner urged that the barges were caused to break loose because the rise of the river was an extraordinary flood. This we cannot find to be the case. The river was high, but not higher than it was likely to be, in the light of experience prior to that time. The petitioner also urged that the river was full of drift, and that a large piece of drift struck the fleet of barges and caused them to break away. These we cannot find to be facts under the testimony. There was quite a lot of drift in the river, but it was upon the opposite side of the river from that where the barges were tied. It is true, one or two of the witnesses testified to seeing a large splash as the barges broke away, from which perhaps, inference might be drawn that some piece of driftwood had struck the barges, were it not for the uncontradicted evidence in the case that the locust trees pulled out. As they fell into the water they must have caused a splash, and as a matter of fact, one

297 F.—16

of the lines which was attached to one of the barges was subsequently found, at some point on the river, with a locust tree fast to its other end.

[4] Taking up, now, the other question as to whether or not the barges were vessels used in navigation, we find the evidence not as satisfactory as it might have been made by the petitioner. That they were all old is beyond question. How old they were does not appear. They were all in bad shape. As one of their witnesses said, that two of them were not very bad. They were sunken barges; that is, they were filled with water and were resting on the bottom of the river at the ordinary level of the water. Of course, inasmuch as they were wooden barges, they would not sink wholly in deep water, and it was when the water rose on the 2d of January, 1919, that the barges rose and floated away. They had been on the Hazelwood side of the river since September in that condition, and were removed from the Bird's Run dock because of congestion there. They all needed to be repaired, and to have repaired them would have cost as much as to have bought new barges. They had not been used, perhaps, for a year or two, and not having been used for a long time, and not capable of use on January 2, 1919, nor any steps taken at that time to have restored them to such a condition that they could be used, the court must hold that the said barges cannot be included within the terms of the act of 1886 above mentioned, as "vessels used on lake or rivers or in inland navigation." It is not necessary to consider in detail the authorities cited, because they would extend this opinion to an undue length.

The petition for the limitation of liability must be refused, at the cost of petitioner.