CLARK et al. v. UNION PAC. R. CO. et al.

No. 4505. Decided April 14, 1927. Rehearing Denied July 12, 1927.
(257 P. 1050.)

*J. W. Robinson,* of Provo, and *J. Robert Robinson,* of Salt Lake City, for appellants.

*George H. Smith, J. V. Lyle, R. B. Porter,* and *Dana T. Smith,* all of Salt Lake City, for respondents.

STRAUP, J.

The appellant, plaintiff below, brought this action to recover damages for the wrongful death of her intestate, resulting from a collision at a public crossing. The negligence alleged on the part of the railroad company is the failure of the train operatives to give signals and warnings of the approach of the train by sounding the whistle and ringing the bell of the engine, operating the train at an excessive and dangerous speed, and failing to observe a proper lookout. The defendant denied the alleged negligence, and pleaded contributory negligence. At the conclusion of all of the evidence, both on behalf of the plaintiff and of the

defendant, the court directed a verdict in favor of the defendant. The motion was based and granted on the ground of insufficiency of evidence to show any of the alleged negligence on the part of the defendant and on the ground of contributory negligence of the deceased in not looking and listening for the approach of the train. The plaintiff appeals. The principal error assigned is the ruling directing the verdict.

The crossing where the collision occurred is about three-quarters of a mile southwesterly of Spanish Fork in Utah county. There the railroad track runs in a southwesterly and northeasterly direction; the public highway in a northerly and southerly direction. The accident occurred in January, 1925, at 9:38 a. m. The weather that morning was foggy. All the witnesses testified that the fog was very heavy; that it was an unusual fog. Some of the witnesses testified that it was the heaviest fog they had ever seen. The testimony is in conflict as to what distance an automobile or train could be seen. Witnesses on behalf of the plaintiff testified that it could be seen at a distance of only 25 to 30 feet, others at a distance of from 50 to 75 feet, and from 50 to 100 feet. Witnesses for the defendant testified that it could be seen 150 feet and more; others at more than 500 or 600 feet. The train was a local train consisting of an engine and two coaches traveling in a southwesterly direction from Spanish Fork. The deceased, driving an automobile truck used in hauling children to school, was approaching the crossing from the south. With him on the seat was another. They were on their way to gather up school children several miles to the north of the crossing and to convey them to Spanish Fork. The train was eight minutes late. The deceased and his companion also were late, due to some disability of the regular truck used in gathering up children north of the crossing. The truck was struck by the train at the crossing, and the deceased and his companion killed. According to the testimony of witness for the plaintiff, the train, after it struck the truck ran 950 feet before it

was stopped, and, according to the testimony of witnesses for the defendant, 907 feet.

We have a statute requiring the bell of a locomotive to be rung continuously from a point 80 rods from a road or highway crossing until the road or highway is crossed, but the sounding of the locomotive whistle at least one-fourth mile before reaching any such crossing is deemed equivalent to ringing the bell. Two witnesses, school girls 15 and 16 years of age, testified on behalf of plaintiff that they lived several miles north of the crossing at or near Palmyra; that the regular truck was not that morning in condition to convey them to school at Spanish Fork; and that Clark, the deceased, was to come after them; that they walked on slowly, expecting to meet Clark at any time; that they were familiar with the crossing, having traveled over it twice very day for a considerable time; and that they also knew the time the train regularly passed the crossing each morning; that, as they walked along the highway, and when about 80 rods from the crossing, they also were about 80 rods from the whistling post northeast of the crossing; that, as they were expecting to meet Clark at any time, they walked along slowly, and that it took them 15 or 20 minutes to walk the last 80 rods befort reaching the crossing; that they theretofore going along the highway often heard the whistle sounded for the crossing, and even when at home heard it several miles away; that on the morning of the accident, knowing the time the train generally came along, they listened for its approach to know how late they would be at school and how many classes they would miss, but that they heard no whistle sounded or bell rung; that, when they got to the crossing, they learned of the accident from section men at the crossing, heard the whistle of the train as it backed into Spanish Fork, and then walked hastily on towards Spanish Fork.

Two other witnesses, each with a team of horses and a wagon hauling beet pulp, were traveling north on the high-

way towards the crossing. They testified that between 9:30 and 9:37 a.m. (the train generally passed the crossing at 9:30) they were about a quarter of a mile, or between a quarter and a half a mile, from the crossing; that they were familiar with the crossing, and knew the time the train usually passed the crossing; that their hearing was good; and that there was no noise or anything to prevent their hearing the bell or the whistle had the bell been rung or the whistle sounded; that they knew they were approaching the crossing, and because of the fog they could not see very far, only from 75 to 100 feet; that they listened for the train to know whether or not it had passed the crossing so their teams would not be hit by the train when they got to the crossing; that they did not hear any whistle sounded or bell rung; that, when they got to the crossing, they learned of the accident and that the train had gone back to Spanish Fork.

Another witness testified for the plaintiff that on the morning of the accident, between 9 and 10 o'clock, he was feeding cattle about 70 or 80 rods south of the crossing; that he was familiar with the crossing, and knew the time the train passed each morning; that in feeding cattle at one certain place all the time he naturally watched for the train and for the time; that on the morning in question he was watching and listening for the train, but heard no bell rung or whistle sounded, and that it was so foggy that a train passing along could not be seen.

Another witness testified that about 9 o'clock on the morning of the accident he was in a field feeding cattle about 55 rods south of the whistling post northeast of the crossing, and about 80 rods from the crossing; that other mornings, while feeding cattle at the same place, he heard the whistle sounded as the train came along, but on the morning in question he did not hear the bell rung or the whistle sounded, and that because of the fog the train was not visible.

This, in substance, is about all of the evidence on behalf of the plaintiff as to the failure of the defendant to give signals or warnings of the train's approach.

The train crew, on behalf of the defendant, testified that the whistle was sounded and the bell rung at different places between Spanish Fork and the crossing, and that the speed of the train as it approached the crossing was about 30 miles an hour. The fireman testified that he saw the truck moving along the highway towards the crossing when it was about 125 feet from the crossing; that he supposed the driver would stop and let the train go by, but, seeing that the driver was not doing so, he gave the alarm to the engineer, who, about 30 or 35 feet from the crossing instantly applied the brakes, and did all that he could to stop the train; that the train was traveling at about 28 or 30 miles an hour; and that the automobile was traveling at about the same speed; but that the engineer was unable to stop the train until it had run 907 feet. A number of other witnesses, passengers on the train, also testified on behalf of defendant. Some of them testified that they felt the application of the brakes, and just a second or two before that heard the whistle sounded, some that the application of the brakes and the sounding of the whistle were at the same time, others that the whistle was sounded just after the brakes were applied, and that they heard no other whistle sounded after the train left Spanish Fork and before the collision. Other witnesses for defendant testified that they heard the whistle sounded frequently between Spanish Fork and the crossing.

While the defendant gave evidence to show that the train ran 907 feet from the crossing, or 937 feet after the brakes were applied, before the train was brought to a stop, the plaintiff gave evidence to show that the train did not stop until it had run 950 feet. Evidence also was given to show the kind of engine and coaches making up the train; that the brakes and equipment were in good condition, the track level, and the rails wet. The plaintiff called an engineer,

and, after sufficiently qualifying him, showed by such witness that such a train, under the conditions stated, traveling 30 miles an hour, could be stopped in a distance of from 300 to 350 feet, traveling 50 miles an hour within 650 feet, and traveling 60 miles an hour within 800 feet. The defendant also called an engineer not the engineer running the train at the time in question, and, after qualifying him, showed by him that a stop made with such a train under the conditions stated within 907 feet was a good stop. The plaintiff gave further evidence to show that, as indicated on the track, sand from the engine was not applied until the train had run 593 feet from the crossing, and that at about that place the truck, as it was pushed along the track, struck a semaphore and bent it, the body of the truck thrown to one side, and the chassis carried 950 feet from the crossing, where the train was stopped, and that the ties were cut and broken along the track from the crossing to the place where the chassis lay. Evidence also was given by the plaintiff to show that the truck was equipped with a governor, which prevented the truck being operated to exceed 18 miles an hour, and that on tests made prior to the accident the truck could not be operated to exceed that speed.

We have thus epitomized the substance of the evidence bearing on the question under consideration. As to the question of signals it is the contention of the respondent that there was direct and positive evidence given that the whistle was sounded and the bell rung, and that the testimony of plaintiff's witnesses was merely of a negative character; that they did not hear either the sounding of the whistle or the ringing of the bell; and that in such case such negative testimony did not raise any conflict in the evidence. In support of that *Jensen* v. *O. S. L. R. R. Co.*, 59 Utah, 367, 204 P. 101; *Quinley* v. *Springfield Traction Co.*, 180 Mo. App. 287, 165 S. W. 346; *Oliver* v. *U. P. R. R. C.*, 105 Neb. 243, 179 N. W. 1017; *Bannister* v. *Ill. Cent. Ry. Co.*, 199 Iowa, 657, 202 N. W. 766; *Seaboard Air Line Ry.* v. *Myrick* (Fla.) 109 So. 193, and other cases, are cited. These cases

in effect hold that a mere negation on the part of a witness that he did not hear the bell rung or the whistle sounded on an engine approaching a crossing will not sustain a finding by a jury that such signals were not given, when it is shown that the witness was not paying attention to the occurrence, and does not know whether the whistle was or was not sounded or the bell rung, and only testified that he did not hear the warning, and that such testimony does not contradict positive and direct testimony of a witness or witnesses that the whistle was sounded and the bell rung. But a reading of the cases and of other cases on the subject shows that it is not the fact of negative testimony, but the character of the negative testimony, which is regarded as not sufficient to support a verdict that signals were not given, or to raise a conflict with testimony that the bell was rung and whistle blown. It is clear that, where one witness testifies that the whistle was sounded and the bell rung, and another witness of equal opportunity to know the fact testifies that he was listening to see whether the whistle did or did not sound and the bell ring, and that the whistle did not sound nor the bell ring, positive testimony is met by positive testimony; and, if the witnesses are of equal credibility, the testimony of the one is entitled to as much weight as the other. Even where a witness testifies that he was listening for signals, and was in position to hear the signals had they been given, and that, if they had been given, he would have heard them, but that he did not hear any signals given, some courts treat that kind of evidence not as negative but as positive testimony. Other courts treat it as negative testimony, but in such case not to be disregarded but to be considered of sufficient probative value to justify a finding that signals were not given, and to raise a conflict in the evidence where there was positive testimony that the bell was rung and the whistle blown. Whether the testimony of a witness, who is shown to have been in position to hear the signals had they been given, that he was listening for them, and would have heard them had they

been given, but heard no signals, be regarded as positive or negative in character, still we think the weight of judicial authority shows that such testimony is of such probative value as to justify a jury in giving as much, or even greater, weight to it than to positive testimony of witnesses that the signals were given if the witnesses are of equal credibility. Though a witness was not specially listening for signals, or giving special attention to the occurrence, yet if his attention was not engrossed or diverted to other things, and it being made to appear that he was in position to hear, and in all likelihood would have heard them had they been given, his testimony that he heard none is still of probative value, and is not to be disregarded, though its weight be not regarded as great as the testimony of a witness who testified that he was specially watching and listening for signals, and heard none, or of a witness that they were or were not given. These views are supported by 23 C. J. pp. 40-47; 9 Enc. Ev. pp. 864 and 869; 1 Jones Comm. on Ev. (2d Ed.) § 21; 2 Elliott, Ev. § 969; *Nor. Pac. R. R. Co.,* v. *Freeman,* 179 U. S. 379, 19 S. Ct. 763, 43 L. Ed. 1014; *Hertell's Adm'r* v. *L. & N. R. R. Co.,* 215 Ky. 639, 286 S. W. 693; *Williams* v. *Boston & M. R. R.* (N. H.) 132 A. 682.

Elliott says :

"Occasionally there are cases where the testimony, though negative in form, is held to be affirmative, as where a person testified that he was very near a railroad crossing and was in a very favorable condition to have heard the locomotive bell or whistle had it been rung or blown, and that he did not hear it."

In Enc. of Ev. the author says:

"It is frequently stated broadly that the testimony of one positive witness is entitled to more weight than that of several negative witnesses. This, however, is not always true. The jury has a right to consider whether the fact testified to by the positive witness is, in view of the negative evidence, reasonable and probable. Although as a general rule positive testimony will outweigh that which is negative in its character, nevertheless, to the jury belongs the duty of determining for themselves what weight, considering all the circum-

stances, they would attach to the testimony of the various witnesses on the point in question. The jury should take into consideration the comparative credibility and means of knowledge of the witness."

And Elliott, supra, referring to cases there cited, further says:

"It is very doubtful whether the doctrine respecting the comparative value of positive and negative testimony is one of law in such a sense as to make it proper for the court to embody it in an instruction. It seems to the writer that there are comparatively few cases where the doctrine can be stated in an instruction as a rule of law."

In Jones, supra, the author says:

"The question of the weight to be given to negative testimony often arises in railroad and other accident cases where it is claimed that signals were not given. In such cases the question is purely for the jury, but it has often been held that negative evidence is sufficient to sustain a verdict. It is familiar practice to allow a witness, after he has described the situation to state that he would have heard a bell or whistle, were it sounded. The testimony of honest and intelligent witnesses that they did not hear a locomotive or an electric car signal is accorded more or less probative effect according to the attention they were paying,"

—to which may be added, and the position in which the witness was and the opportunity he had to hear the signal, had it been given.

In *Hertell's Adm'r* v. *L. & N. R. R. Co.*, supra, the court said.

"When it is shown that a witness or witnesses are near enough to hear and are in position to hear and are possessed of the usual human auditory faculties and are able to hear the blasts of a train whistle or other train signals, but did not hear such signals, the case is one for the jury when it is testified by the train operatives that signals were given. We have many cases so holding."

In *Russell* v. *Watkins,* 49 Utah 598, 164 P. 876, this court said:

"The weight of negative testimony of witnesses, as to the giving of signals, ordinarily is for the jury to determine; but, when physical

conditions and the attending circumstances are such as to render it highly improbable that they could hear, we think the rule should be and is otherwise."

The school girls traveling from the north towards the crossing testified that they were familiar with the crossing, and knew the time the train came along; that they were where they could hear the sounding of the whistle or the ringing of the bell had such signals been given; that they were listening for the signals; and that they heard none. That also is shown as to the two witnesses hauling pulp and approaching the crossing from the south. Because the accident had happened and the train had gone back to Spanish Fork, which took considerable time, five or ten minutes after the accident before the train started back, some time consumed at the depot after the train arrived, and section men dispatched from there to the scene of the accident to remove broken parts of the truck from the track, and the section men at the scene when these witnesses got to the crossing, it is argued by the respondent that such witnesses were not where they could have heard the signals had they been given; that the girls were much farther to the north walking along the highway, and the witnesses hauling pulp were down by the beet factory a mile or two away when the train passed and the accident occurred, and that hence none of such witnesses was in a position to have heard the signals had they been given. The trial court evidently took that view as to the testimony of such witnesses.

But the men hauling pulp testified that between 9:30 and 9:35 or 9:37 they were a quarter of a mile, or between a quarter and a half a mile, from the crossing, walking behind their wagons; that they were familiar with the crossing, and knew the time the train came along and that they were listening for its approach, and, because of the fog were paying attention and listening, so that the train would not collide with their teams when they reached the crossing. That also is true as to the testimony of the school girls who

testified that, at the time the train usually passed, they were along the highway about 80 rods from the crossing; that they walked along slowly, expecting to meet Clark at any time, and that it took them 15 or 20 minutes to reach the crossing. However plausible the contention of the respondent may be, nevertheless it rests upon argument, deductions, and inferences. Whatever force may be given them, we nevertheless are of the opinion that the weight of the testimony of such witnesses was a question for the jury, in view of all the evidence bearing upon their position and opportunity of hearing the signals had they been given and the attention which they gave in listening for signals. The same observation may be made as to at least one of the witnesses feeding cattle, who testified that he was listening for signals to ascertain when the train came along. We thus think that the evidence adduced by the plaintiff was sufficient to warrant a finding by a jury that the signals were not given, and was sufficient to raise a conflict in the evidence as against the positive testimony of witnesses on behalf of the defendant that the signals were given.

Further as to this: Several witnesses called by the defendant, passengers in the coach, testified that they felt the brakes applied, and about the same time heard the sounding of the whistle; some that the whistle sounded a second or two just before the brakes were applied, and some just after the brakes were applied, and that they heard no other whistle after the train left Spanish Fork. The engineer operating the train testified that he applied the brakes about 30 feet from the crossing. Even upon that testimony a jury could have found that no signals were given until about 30 feet from the crossing, and that such a signal was so untimely as to be no warning, though the train was traveling not to exceed 30 miles an hour. True, it is argued that these witnesses had no occasion to notice whether signals were or were not given, until the brakes were applied, until something unusual to attract their attention to the movement of the train, and hence their testimony that no

prior signals were heard by them has no probative value. That again is mere argument, and goes merely to the weight of the testimony. The jury had the undoubted right to consider such testimony. Though it should be regarded as of less weight than the positive testimony, yet for such reason it was not to be disregarded, but was entitled to be considered and weighed in connection with all other testimony and circumstances bearing on the question. It thus is our opinion that the plaintiff was entitled to go to the jury as to whether timely and proper signals or warning of the approach of the train were or were not given.

Now as to the alleged negligence that the train was operated at an excessive and dangerous speed in view of the character of the crossing and of the foggy condition of the weather: The only evidence given by the plaintiff as to the speed are the circumstances that the train consisted of an engine and two coaches; that the brakes and appliances were in good condition, the track level, and the rails wet; that the engineer, about 30 feet from the crossing, attempted an emergency stop by applying the brakes and doing all he could to stop the train, but was unable to do so until it had traveled a distance of 950 feet; and the testimony of an experienced engineer that under such conditions such a train, traveling 60 miles an hour could be stopped within 800 feet. From that it is claimed by the plaintiff that a jury would have been warranted in finding and could have found, that the train as it approached the crossing was traveling 60 miles an hour, which, as it is further contended, in view of the character of the crossing and the condition of the weather, was a negligent and dangerous operation of the train. Whatever may be said as to the weight of the testimony of such witness within what distance a train could under the circumstances have been stopped, still we think it was some substantial evidence to show that the train was operated at an excessive and dangerous speed, especially in view that the truck was hurled and carried forward with such force as

to break and cut the ties of the track, bend a semaphore 590 feet from the crossing, and carry the chassis 360 feet farther before the train was stopped. And, in view of the condition of the weather and of the character of the crossing, we are also of the opinion that it was within the province of the jury to say whether or not operating a train at such a speed in approaching a crossing constituted negligence. It is argued that the engineer testifying upon behalf of the plaintiff was, when in the employ of other railroad companies some years prior therto, discredited by them, and later discharged, and had not operated the particular type of engine as was operated on the day in question, but had operated similar types, and for that and other reasons his testimony in what distance a train under the conditions stated traveling 60 or 30 miles an hour could have been stopped was unreliable, and that upon credible testimony it was shown that such a train under the conditions stated could not have been stopped short of 907 feet, traveling at 30 to 33 miles an hour, and as testified to by the engineer called by the respondent. It is not for us to say which of these witnesses was the more capable or credible. That was something for the jury. It also is argued that the testimony of the train operatives that the train was moving at a speed of 30 miles an hour was of greater weight than the testimony of plaintiff's witness, and that his testimony was not of sufficient probative value to raise a conflict in the evidence as to the speed. That, as already indicated, was also, as we think, a matter of weight of testimony and credibility of the witnesses.

Now as to the question of contributory negligence on the part of the deceased. We think that is the most difficult question in the case, and one not free from doubt. The negligence charged is that the deceased failed to stop or look or listen for the approaching train, and drove on the track without stopping, looking, or listening. It is not charged that he otherwise was guilty of any negligence. The rule is well established in this jurisdiction, as

in many others, that a traveler in approaching a crossing is required to look and listen both ways for approaching trains, and driving upon a crossing without looking and listening, when to look and listen would have apprised him of the approach of the train, constitutes negligence as matter of law. While in some jurisdictions the traveler is also required to stop before attempting to pass over a crossing, still in this and in most jurisdictions such question is one of fact and not of law. In other words the rule that a traveler in approaching a crossing is, before attempting to pass over it, required to look and listen, has become a rule of law, while the other, to also stop, is but a rule of evidence, depending upon, and circumscribed by, the particular circumstances and conditions of the case; and hence generally is a question for a jury. The burden of proving contributory negligence, of course, was on the defendant. In the absence of evidence, there is a presumption that the deceased looked and listened, and did all that prudence and due care required. The only direct evidence we have bearing on the question is the testimony of the fireman that he discovered the truck moving towards the crossing about 125 feet from the crossing, and traveling at about the same speed that the train was going, 28 to 30 miles an hour; that the curtains of the truck were rolled up, but that he did not notice the men in the truck when he first saw it, but saw their faces through the glass just before the truck reached the crossing. But the fireman did not testify in what direction the driver of the truck or his companion was looking, or what they were then doing, except that the truck was moving towards the crossing, and was about to enter it; that, when he discovered the truck, he did not say anything to the engineer, because he thought the truck would stop before it got to the crossing, but seeing it was not going to stop, he, when it was about 25 feet from the first rail, gave the alarm to the engineer. He further testified that there was a headlight on the engine burning at the time. To what extent the fog affected the rays is not shown. Plaintiff showed

that the truck, equipped as it was with a governor, could not be operated at a speed to exceed 18 miles an hour. Plaintiff had the right to go to the jury on the evidence that the truck was running not to exceed 18 miles an hour.

The question thus is, Does the record conclusively show that the deceased failed to look and listen, and that by looking and listening he could have discovered the approach of the train in time to have stopped and let it pass? The evidence bearing on the question must be considered in the light most favorable to the plaintiff. In doing so we must assume that the train approached the crossing without sounding the whistle or ringing the bell or otherwise giving any warning of its approach. We must also assume that, because of the fog, the deceased could not see an approaching train at a distance to exceed 30 to 100 feet. We must also assume that the train was running about 60 miles an hour. At that rate it would take a train only 15 seconds to travel 80 rods, or 1.14 seconds to travel 100 feet, or 5.7 seconds to travel 500 feet. If the train was traveling 30 miles an hour, it would take it 30 seconds to travel 80 rods, 11.4 seconds to travel 500 feet, and 2.28 seconds to travel 100 feet. Thus, in view that no signals or warnings of any kind were given of the approach of the train, and because of the fog a train could not be seen for a distance of more than 30 to 100 feet, can it be said that as matter of law the plaintiff was negligent because he did not discover the train in time to avoid the collision? Where a traveler, knowing that he is approaching a railroad crossing and with an unobstructed view of the track in both directions, and there being nothing to prevent his hearing or seeing an approaching train, advances to and upon the intersection without looking and listening, his conduct will generally impute negligence to him as matter of law. While he is required to choose in the vicinity of the crossing, according to the environments, a place reasonably calculated to afford an opportunity for seeing and hearing, and to exercise his

faculties until he had passed the crossing, yet the law does not invariably or arbitrarily fix the distance at which he must begin to look and listen, provided he looks and listens at a sufficient distance to enable him to discover an approaching train and avoid injury. When a traveler, in approaching a crossing, has a clear and an unobstructed view of the track for a sufficient distance to see and discover an approaching train in time to avoid colliding with it, and advances upon an intersection, and is struck by the train, the presumption arises that he did not look, or, if he did look, did not heed what he saw, unless under circumstances of exceptional cases where he is misled without his fault by some act of the company. While one who approaches a crossing has a right to assume that the railroad company will give the usual and proper signals and warnings of approaching trains, and, when he can neither see nor hear any sounds of a moving train, may assume, that the crossing may be made safely, yet, such assumption or reliance does not thereby relieve him from the duty of looking and listening nor from using his faculties to avoid danger; but the giving of signals or the failure to give them nevertheless has a bearing on the question of discovery of the train by the traveler in the exercise of due care and by making proper uses of his faculties of sight and hearing. But what is the situation where, by reason of a fog or other obstruction, the view is obstructed so that a train cannot be seen 50 or 100 feet away? Good authorities teach that it is only when it appears from the evidence that a traveler might have seen had he looked, and might have heard had he listened, that his failure to look and listen will necessarily constitute negligence. *Martin* v. *Little Rock R. R. Co.*, 62 Ark. 156 S. W. 545; *Tiffin* v. *St Louis, etc., R. R. Co.*, 78 Ark. 55, 93 S. W. 564; *Brossard* v. *C. M. & S. P. R. R. Co.*, 167 Iowa, 703, 149 N. W. 915; *Winey* v. *Railway Co.*, 92 Iowa, 622, 61 N. W. 218; *Winstaley* v. *C. M. & S. P. R. R. Co.*, 72 Wis. 379, 39 N. W. 856; *Davis* v. *Concord, etc.*, R. R., 68 N. H. 247, 44 A. 388; *Hicks* v. *New York, etc.*, Co., 164 Mass.

424, 41 N. E. 721, 49 Am. St. Rep. 471; 2 Thompson, Comm. on Neg., §§ 1650 and 1671. At section 1650 the author says:

"But whether it is negligent in him (the traveler) to fail to look and listen where the view is obstructed or where there are complicated circumstances calculated to deceive and throw him off his guard, presents a question for the jury."

It is argued that, inasmuch as the deceased, because of the fog, could not see an approaching train at a distance to exceed 50 or 100 feet, he was required to more vigilantly use his sense of hearing and to more attentively listen for the approaching train. That may be conceded; but if no signals or other warnings are given, the trier of the facts might find that vigilant and attentive listening would not have apprised the traveler of the approaching train, and that he otherwise could not have heard it. It also is argued that, if he could neither see nor hear an approaching train, and could only see for a distance of from 50 to 100 feet, due care required him to stop and ascertain whether he could safely pass over the crossing before attempting to do so. But, as already observed, in this jurisdiction, where the requirement to look and listen is a rule of law, but to stop a rule of evidence, the question as to whether the deceased in view of all the circumstances, ought to have stopped, was of fact and not of law. That, in addition to the cases already cited, is also illustrated by the following cases: *Malone* v. *S. L. & S. F. R. R.* (Mo. App.) 285 S. W. 123; *Erie R. R. Co.,* v. *Weinstein* (C. C. A.) 166 F. 271; *Beckham* v. *Hines, etc.* (C. C. A.) 297 F. 241; *Baltimore & Ohio R. R.* v. *Goodman.* (C. C.) 10 F. (2d) 58; *U. S. Dir. Gen. of Railroads* v. *Zanzinger* (C. C. A.) 269 F. 552.

Lastly, in accordance with the testimony of the fireman that he discovered the truck when it was about 125 feet from the crossing, it is argued that, had the deceased then looked, he could have discovered the train in time to have avoided the collision. The distance at which the fireman discovered the truck at best is but an estimate; and from all the evi-

dence a jury might find that the distance was much less, that it was not to exceed 75 feet or even less. Nor is a jury required to take such estimate as an exactness. Further, the jury could have taken the view that the truck could not have been operated at a speed to exceed 18 miles an hour, and that the train was operated at about 60 miles an hour. In such circumstance, while the deceased was traveling 125 feet, the train was traveling approximately 500 feet, and that, had the deceased looked when 125 or 100 feet from the crossing, he, because of the fog, could not have seen the train, and might have inferred that no train was in sight, and that none was approaching when he started to cross or was about to pass over the crossing, and that the train came upon him too swiftly to discover it and permit his escape. Though a jury might not on the evidence take the view that the train was going 60 miles an hour, yet, it could take the view that it was traveling at a speed greatly in excess of 30 or 35 miles an hour. It might also take the view that the truck was not operated at its speed capacity, but at a speed considerably less. And, under such circumstance, taking the evidence most favorable to the plaintiff, the deceased, looking and listening when but 75 or 50 feet or less from the crossing, could not have seen an approaching train traveling three or four times the speed the deceased was going, and have discovered it in time to have avoided the collision. Thus, under the circumstances, we are of the opinion that the question of contributory negligence also was one for the jury.

We are therefore of the opinion that the court erred in directing the verdict. The judgment of the court below is reversed and the cause remanded for a new trial. Costs to the appellant.

THURMAN, C. J., and CHERRY and GIDEON, JJ., concur.

HANSEN, J., being disqualified, did not participate.

RITCHIE, District Judge (dissenting in part.) I feel obliged to dissent from the opinion of the court on the question whether there was sufficient evidence to submit to the jury concerning the giving or not giving of signals. There is positive evidence that the automatic bell was set ringing by the engineer at Spanish Fork station, and that it rang continuously until the accident. There is also testimony, not only of the train operatives, but of passengers, that the whistle was sounded at every public crossing between Spanish Fork and the place of the accident.

I do not think that the mere negative testimony of the five witnesses that they did not hear the signals is sufficient to carry that question to the jury, and I think the trial court was correct in withdrawing it from them.