PIPPY v. OREGON SHORT LINE R. CO.

No. 5067. Decided May 11, 1932. (11 P. [2d] 305.)

*Willard Hanson* and *A. H. Hougaard,* both of Salt Lake City, and *B. L. Liberman,* of St. Louis, Mo., for appellant.

*George H. Smith, R. B. Porter,* and *W. Hal Farr,* all of Salt Lake City, for respondent.

STRAUP, J.

This action was brought by the plaintiff and appellant to recover damages for personal injuries. At the conclusion of the plaintiff's evidence a motion for nonsuit was granted on the ground of contributory negligence and the action dismissed. He appeals assigning the ruling as error. By his complaint, so far as here material, he in substance alleged that the accident occurred at a public crossing on Eighth West and Fourteenth North streets in Salt Lake City by a collision of a passenger train operated by the defendant and a Ford motortruck driven by the plaintiff; that at the intersection of the public street or highway the defendant maintained eight parallel railroad tracks running in a northwesterly and southeasterly direction crossing at an acute angle of less than forty-five degrees the street or highway running north and south, the two railway tracks farthest westerly being known as the south-bound and the north-bound main lines upon which passenger trains were operated between Ogden City and Salt Lake City, and that the other six tracks were used as storage and freight tracks upon which railroad cars and trains were stored in such close proximity to the traveled portion of the street and highway as to obstruct the view of trains operated on the main lines, especially of trains operated from the north. Then it is alleged that the defendant, whose duty it was to keep the crossing in repair, negligently suffered and permitted it to be out of repair and portions of the street which was about 66 feet in width to be washed away so that only a space of about 18 feet in width remained on which the public could travel in crossing the intersection, and because thereof and of the obstructions, the crossing was rendered dangerous and unsafe; that for the safety

and protection of the public using the crossing, it became the duty of the defendant in the exercise of due care to maintain a watchman or flagman or gates at the crossing to warn travelers of the approach of trains and that the defendant negligently failed to do so; that the defendant maintained an automatic electric bell signal just westerly of the south-bound main line track and close to the street or highway, for the purpose of giving warning of the approach of trains, but that the defendant negligently suffered and permitted the signal bell to be out of repair so that the bell on the day and at the time the plaintiff approached the crossing and attempted to pass over it and at the time of the collision failed to ring or function or give any warning of the approach of trains and particularly of the approach of the train from Ogden from the north on the southbound main line and which struck the plaintif's truck. It then further is alleged that on the day and at the time in question the defendant negligently stored and maintained, so near the traveled portion of the street or highway at the intersection, cars on the storage or freight tracks as to obstruct the view of one driving over the crossing from the north to the south of trains approaching from the north or northwest, and as the plaintiff was attempting to drive over the crossing from the north to the south, because of the alleged negligence of the defendant and of its further alleged negligence in operating the passenger train from the north on the south-bound main line or track over the crossing at a negligent and dangerous rate of speed at fifty miles an hour and without sounding the whistle or ringing the bell of the engine or giving any warning of the approach of the train, his truck was struck by the train causing the injuries complained of.

The answer in effect was a general denial and a plea of contributory negligence, that the plaintiff "could have seen said approaching train for a long distance from said crossing and for a considerable distance before the said plaintiff reached said crossing and that plaintiff's failure

to look and listen for said train before driving upon said crossing was the proximate and sole cause of said collision and of plaintiff's injury."

Upon these issues the case was tried to the court and a jury resulting in the granting of a nonsuit at the close of plaintiff's evidence. No point is made as to insufficiency of the evidence to show the alleged negligence of the defendant. The ruling of the court is defended solely on the ground of contributory negligence. There is evidence to show the alleged condition of the crossing, the obstruction of the view of approaching trains, the absence of a watchman and of gates to warn travelers of the approach, that the signal bell did not ring at the time in question, that the train as it approached and passed over the crossing was operated at a speed of from fifty to sixty miles an hour, and after it struck the truck did not stop until it ran a distance of about three city blocks, about 1,980 feet, that the whistle was not sounded nor the bell rung of the locomotive as the train approached the crossing, and that no warning was given of its approach. Evidence was also given to show that about 900 feet north of the crossing the railroad tracks curved in a northerly or northeasterly direction, which prevented a view of trains from such direction beyond that point. At the crossing planks about 18 feet long were placed between the rails of the various tracks, the rails extending above the planks. The space between the tracks was filled in with gravel and cinders. The length of the planking constituted the width of the traveled portion of the crossing, which was rough and bumpy and in bad condition; that one ordinarily could drive over the crossing with a motor vehicle only in low gear, and because of the acute angle made by the railroad tracks running diagonally across the highway, one driving over the tracks was required to drive "zigzag" over them, and the rails being higher than the roadbed considerable care was required in driving "else you might shoot down the track and the steering wheel thrown out of your hands."

The plaintiff was familiar with the crossing, having driven over it at different times before in going to and from his work; his residence being north and east and his place of work south and west of the crossing. On the day in question, the plaintiff with three others in going to work on a Ford motor truck approached the crossing on Eighth West street from the north driving south at about 8 o'clock in the morning. The weather conditions were good and practically clear. The plaintiff was driving the truck, seated on the left-hand side at the wheel. On the seat with him and to his right was a Mr. Bergstrom, who was killed. On the back part of the truck were Mr. Hagberg, and his stepson Mr. Moon, about twenty years of age. The plaintiff testified that as they approached the crossing, the first track reached by them was what is called the oil track running to oil works. The next five tracks are referred to as storage and freight tracks, then the northbound main line track, and then the southbound main line, the most westerly track. The plaintiff testified that when they approached the oil track and before entering upon it he looked and listened for trains but heard and saw none, that because of box cars on four of the freight and storage tracks next to the northbound main line his view was obstructed on the main line to his right or to the north or northwest; that he had a view of the main line only in front of him and of the signal bell which was westerly of and near the south-bound main line and near the traveled portion of the street or highway; that he listened for the signal bell, but it was not ringing; "that it did not ring at any time that we passed over the intersection and up until the time the automobile (the truck) was struck." He testified that as he was passing over the intersection he looked and listened as he passed over each track but could not see to the north and northwest because of box cars on four of the freight or storage tracks next to the main line, and which extended out in the street about 20 or 25 feet from the center of the planking; that when he passed over the last freight track immediately next to

the north-bound main line, he looked for trains, first to his left then to his right, and saw no train coming either way; that he was traveling between five and six miles an hour in low gear; that he was not aware of the approach of the train until his companion sitting to his right exclaimed, "My God, a train," at which instant the truck was struck by the train, rendering the plaintiff unconscious; and that he remained so for eleven days thereafter. When the train was stopped the plaintiff and his companion were found unconscious on the pilot of the engine. His companion died shortly thereafter.

The plaintiff further testified that in going over the crossing he looked for cars, looked where he was driving, and watched the stationary signal bell; that there were cars also on the freight tracks to the southeast of the crossing, but he could not tell how close they were to the crossing and that there was as much danger of trains approaching from the south as from the north; and that the signal bell when it rang had a very distinct ring similar to a bell on a railroad locomotive. He further testified that after he passed the last cars on the freight tracks to the north or northwest of him and looking to his left and then to his right or to the north and northwest for cars and discovered none on the main line, he could see up the track only 100 or 150 feet, and that: "When I first got to a point where I could see along the main tracks I commenced to look and I continued to look until I got knocked out. I also had to look at the road to see the way my automobile was going. I would just glance ahead to see if the car (the truck) was running at an angle or running straight. The automobile was running on the same angle as the street was. I looked up the main track as far as I could see and there were no trains in sight." He further testified that one standing on or near the main line had a view up the track to the curve, a distance of about 900 feet, but not when sitting in and driving the motortruck, for the reason "that the closer we got to the south-bound main line the less we could see up

the track because of the angle at which the street we were on runs to the track"; that in such position one could not turn his head clear around to look up the track to the curve and that the nearer he got to the south-bound track the more the direction up the track was to his back; and that "looking just naturally, that is, turning the head as you would naturally turn it, we could see back about 150 feet," and there was no train then in sight and that if he had turned his head and body clear around to look back up the track he could not properly have handled the motor-truck and prevented it "from turning into the tracks."

Hagberg testified that he was on the back of the truck as they approached and drove over the crossing and that he was facing north or northwest in the direction from which the approaching train came; that he was familiar with the crossing and listened for trains as one ordinarily does in crossing a crossing; that he was familiar with the automatic crossing bell and was paying attention to see if he could hear it ring; and that the bell was not ringing as they approached and were going over the crossing. He further testified that the approaching train did not whistle and that he was not aware of its approach until Bergstrom exclaimed, "My God, Red, here comes the train"; that he then heard the train whistle and a bell ringing at the crossing, but whether it was the crossing bell or the engine bell he could not say, because, as he testified, everything happened so fast. He further testified that the part of the motortruck in which he was riding was then just pulling off the rails of the last freight track; that he did not observe whether there were freight cars on all the tracks, but that the freight track next to the main line had a car right close to the edge of the roadway; that it was impossible to see much on account of the cars on the freight track and that he did not see any train coming until the alarm given by Bergstrom; that he jumped and cleared the first rail of the first main line; that the train running between fifty and sixty miles an hour rushed by when he was still in

the air, and that the train did not slow down until the coaches had passed the crossing and did not stop until it was three city blocks from the crossing; that after it stopped he ran to the front on one side of the train and his stepson on the other and found the plaintiff and Bergstrom unconscious on the pilot. He further testified that in the position he was sitting in the truck it was impossible to see up the track of the main line as far as the curve because of the angle created by the tracks running diagonally over the highway.

Moon, the other witness for the plaintiff testified that in driving over the crossing the plaintiff had to drive in low gear because of the condition of the roadway and "if one did not hit the tracks square the motor car would turn, go down the track and was liable to throw the steering wheel out of the driver's hands" that there were box cars on each side of the crossing which interfered with the view up the main line track until right on it. He further testified: "That as we approached the crossing we were looking for trains and listening for the bell, that is the automatic bell on the pole next to the crossing and which was next to the south bound track and that the bell was supposed to ring when a train was coming"; that on the morning in question he did not hear the signal bell ring, that he was listening for it and that "was the only way one can tell if a train is coming because it could not be seen coming, that is, you cannot see a train coming from the north on account of the box cars. If you are coming from the north going south, you have to depend on the automatic bell"; that on the morning of the accident he did not hear the locomotive bell or any whistle, until Bergstrom exclaimed a train was coming and at that time they were about halfway across the south-bound main line track; and that he "jumped straight out of the back of the truck and lit between the two main lines." He further testified that the train was going about fifty or sixty miles an hour and that the cars on the freight tracks were about 15 feet from the north line of the roadway on the track next

to the main line track; that there were cars on different tracks close to the crossing and cars also on the south or southeast of the crossing on nearly all the tracks; that "after you get by the box cars you cannot see up the main line tracks unless you turn your head clear around. That is because of the angle at which you are traveling. I have tried that several times and you cannot turn your head far enough to see the cars when they are coming, but you have to turn your body around."

The plaintiff testifed that when the motortruck was struck he thought the front of the truck had just started on the south-bound track or was within a foot or 2 feet of it; that the brakes of the truck were in good condition and going at the rate of speed he was going he could have stopped the truck within 6 to 12 feet. The distance from the outer rail of the last freight track on which the box cars stood to the first rail of the south-bound main line was about 27 feet.

On cross-examination by counsel for the defendant, one of the witnesses, on being shown photographs stated by counsel in the course of examination to have been taken by the company several hours after the accident, identified them as photographs of the crossing, but testified they did not show all of the cars on the freight tracks as they were at the time of the accident, and thought that the photographs did not show the cars to be as near the traveled portion of the highway as they were at the time of the accident. No evidence was given or offered to show that the condition of the crossing and the position of cars and the number of them on the freight or storage tracks were the same when the photographs were taken as at the time of the accident. However, upon counsel stating at what point or points they were taken, they without objection were received in evidence. Some of the photographs show a general view of the crossing approaching it from the north and from the south; some, a string of box and refrigerator cars standing on the two freight tracks next to the north-bound main line; but the exact or accurate position or dis-

tance such cars were from the traveled portion of the cross-
ing or the exact distances between objects cannot be as-
certained by merely looking at the photographs.  However,
what difference, if any, there may be as to the number of
tracks on which cars stood at the time of the accident or
as to the proximity of them to the traveled portion of the
crossing as may be gleaned from the photographs, and the
testimony of the plaintiff and of his witnesses, but raises
a conflict in the evidence, and in such respect in considering
the question in hand we must take the evidence most favor-
able to the plaintiff.

The case thus presented is one not of an ordinary crossing
but one of rather complicated conditions and surroundings;
one where because of conditions of the roadbed at the cross-
ing the driving of a motor vehicle over it required more than
usual attention, where the view of approaching trains was
obstructed by box cars placed on three or four adjoining
freight or storage tracks in close proximity to the traveled
portion of the crossing, where, and as testified to by the
plaintiff and his witnesses, because of the acute angle cre-
ated by the railroad tracks running diagonally over the
intersection of the public street, discovery of approaching
trains from the north or northwest was rendered more diffi-
cult in driving a motor vehicle over the crossing from north
to south, and where the signal bell maintained at the cross-
ing to warn travelers of the approach of trains was silent
as the train which struck the motor car approaching the
crossing.  The case is thus to be considered in view of such
conditions.

The law is well settled in this jurisdiction and generally
in other jurisdictions that a traveler in approaching a rail-
road crossing and before attempting to pass over it is re-
quired to look and listen for approaching trains and
to exercise due care and vigilance in driving over the
crossing, and that if he does not do so he is guilty of
negligence; that where a traveler, knowing that he is ap-
proaching a railroad crossing with an unobstructed view of

the track in both directions and there being nothing to prevent his hearing or seeing an approaching train, advances to and upon the intersection without looking and listening, his conduct will generally impute negligence to him as a matter of law; and that when a traveler approaching a crossing has an unobstructed view of the track for a sufficient distance to see and discover a train in time to avoid colliding with it and advances upon the intersection and is struck by the train, a presumption arises that he did not look or if he did look he did not heed what he saw and thus is guilty of negligence, unless under circumstances of exceptional cases where he is misled without his fault by some act of the company. *Clark* v. *Union Pac. R. Co.*, 70 Utah 29, 257 P. 1050. Such are statements of mere general principles of law applicable to railroad crossings recognized by this court in a number of prior decisions as well as by numerous decisions of other jurisdictions. In cases such as *Schofield* v. *Chicago, Milwaukee & St. P. Ry. Co.*, 114 U. S. 615, 5 S. Ct. 1125, 29 L. Ed. 224, and in many others of similar facts, where a traveler approaching a railroad crossing had a clear and unobstructed view of the track and could have seen a coming train during its progress at a sufficient distance to discover its approach and avoid the collision, but failed and neglected to do so, the application of such principles imputing negligence to him is clear. In such case, had the traveler looked, reasonable minds may not differ that the approach of the train could have been discovered by him, nor could he in such case be heard to say that he looked but did not discover the train in plain view, nor excuse a failure to look or listen by the claim that he relied on warnings to be given of the approach of trains and that none was given.

The usual difficulties arising in cases of this character are when they involve complicated conditions and circumstances, such as or similar to those here present. With respect to them it may be said courts are not of one accord and that a variety of views have been expressed concerning

the question of contributory negligence. Some of the cases are irreconcilable. The conflict, however, does not go to the proposition that under complicated conditions the traveler is relieved from looking and listening for the approach of trains, or from exercising due care and vigilance to avoid injury. That is his duty at all times and on all occasions in approaching a railroad crossing and in driving over it, whether the view is obstructed or unobstructed, and the greater the hazard or danger surrounding him the greater is the care required of him. The conflicts in the decisions arise over the question or subject of whether the traveler in view of the attending conditions and circumstances exercised that amount or degree of care in looking and listening and that quantum or degree of care otherwise required of him. If in a given case the traveler approaching or driving over a crossing where the view of approaching trains is obstructed, or where the conditions are complicated, without looking or listening or otherwise paying attention to his surroundings, his negligence is just as culpable, if not more so, than when approaching a crossing and going upon and over it without looking or listening or paying attention to his surroundings where the view of approaching trains is unobstructed or where there are no complicated conditions or circumstances.

It of course is well established that the right of the public to the use of a public crossing is mutual, coextensive, and reciprocal with that of the railway company, except that the latter, because of the momentum of trains, the confinement of their movements to the track, and the necessity and public nature of railway traffic, has the unquestioned right of way. Such precedence, however, does not impose upon the traveler the whole duty of avoiding collisions. Both parties must exercise due care and diligence with regard to their duties and are charged with the mutual duty of exercising reasonable care and diligence to prevent injury, and that the performance of such duty may, to a limited extent, be relied on by each. Train operators

may assume, until the situation otherwise discloses, that one approaching a railway track will yield precedent to the right of way and will exercise ordinary care to take care of himself, and the traveler to a limited extent may rely on the railway company giving customary and required warnings and will otherwise observe the requirements of ordinary care; but as a railway track is itself a warning of danger, the traveler in all cases is in duty bound to exercise proper precaution to inform himself as to the proximity of trains before attempting to enter and go over a crossing. 3 Elliott on Railroads (3d Ed.) § 1646. And to that effect was it said in the Clark Case, supra, that while one approaching a railway crossing has the right to assume that the railway company will give the usual and proper signals and warnings of approaching trains, and when he can neither see nor hear any sound of a moving train he may assume the crossing may be made safely, yet such assumption or reliance does not relieve him from the duty of looking and listening, nor from using his faculties to avoid danger.

With the exception of the rule of law that one in approaching and entering upon a railroad crossing is required to look and listen, the question of contributory negligence is ordinarily one of fact for the jury. 52 C. J. 475, where numerous cases are cited from the federal courts and from about every state in the Union and from Canada and Ontario. Following that, illustrations and references are given as to when the question of contributory negligence should be submitted to the jury and when not, with citations of authorities. In the Clark Case we approvingly referred to 2 Thompson, Comm. on Neg. §§ 1650 and 1671, to the effect that contributory negligence will not in all cases be imputed as matter of law to a traveler where the view was obstructed or is struck by a moving engine or train, if he exercised reasonable diligence and care in the use of his faculties to discover whether an engine or train was approaching before exercising his right of passage and where the train advanced upon the crossing without giv-

ing the statutory or customary warning signals, especially at an excessive rate of speed and under circumstances where because of obstructions the traveler could neither see nor hear the source of danger; and that in such case, the question of contributory negligence ordinarily becomes one of fact for the jury. But let us here again say, as was in effect said in the Clark Case, that in approaching or attempting to pass over a crossing whether the view is obstructed or unobstructed, the traveler may not excuse a failure to look and listen for approaching trains and engines on the assumption that proper signals will be given of their approach, or that trains will be operated at a reasonable or proper rate of speed, for the traveler is in duty bound to look and listen and use all reasonable care to discover approaching trains and avoid injury to himself. Still, and as we also said in the Clark Case, the giving of signals or the failure to give them has a bearing on the question of discovery of a train by the traveler in the exercise of due care and in the making of proper uses of his faculties of sight and hearing. That is but common sense, and no one will hardly deny that the timely sounding of the of the whistle or the ringing of the bell on the engine of an approaching train will greatly aid in discovering its approach.

Thus, how here stands the case? It is not one where the traveler approached the crossing and attempted to drive over it without looking and listening, nor is it one where the view of approaching trains was unobstructed. It is one of rather complicated conditions as shown by the testimony referred to. The plaintiff testified, and so did his companions in the rear of the truck, that as they approached the crossing and before entering upon it they looked and listened for approaching trains and neither saw nor heard any. Because of box cars on the freight tracks and of the curve, their view to the north or northwest was obstructed and prevented; and if the train which struck the motortruck was running between fifty and sixty miles an hour,

as on the evidence we must assume it did, the train was a considerable distance beyond the curve and not in view when the plaintiff approached and entered upon the crossing. Thus, neither seeing nor hearing any train and watching the signal bell which was silent in front of them on the other side of the crossing, they entered upon it. But the exercise of care by the plaintiff did not rest at that. He testified that he watched, looked, and listened as he drove over each railway track, but the box cars on the freight tracks shut off his view of the main line to the north or northwest, and thus he did not see nor hear the approach of the train. In that he is corroborated by his companions surviving the accident. In front of him was still the silent signal bell inviting him on. As soon as he passed the box cars on the last freight track and while approaching the track of the north-bound line, he, as he testified, looked to his left and then to his right, to the north or northwest, and neither saw nor heard a train approaching on either the north-bound or on the south-bound main line, the south-bound line on which the train approached lying southwesterly of the northbound line; and having so looked and neither hearing nor seeing the approach of any train, and the signal bell still silent, he, without again looking, drove over the north-bound track and approached near or partly on the south-bound track when he was struck by the train from the north or northwest on the track.

It is at this point where by the respondent it is claimed the plaintiff as matter of law was guilty of negligence. In such respect it is asserted that: (1) After the plaintiff passed the box cars on the last freight track he had a clear view of the track on which the train which struck the motor-truck was approaching for a distance of at least 900 feet, or up to the curve, and that had he then looked he could have discovered the train in time to have avoided the collision, and as he did not discover it, it, notwithstanding his testimony, must be conclusively presumed that he did not look in that direction at any time after he passed the box

cars on the freight track, or if he did look he looked so inattentively and heedlessly as to render his looking of no avail; and (2) the fact that the signal bell was silent did not relieve or excuse the plaintiff after he passed the cars on the freight track to attentively and continuously look in the direction in which the train approached before going on or approaching so near the south-bound track as to be struck by the train.

In so contending, no or not sufficient importance is attached to the testimony as to the condition of the highway rendering it more difficult to drive a motor vehicle over it, nor to the acute angle occasioned by the railroad tracks diagonally crossing the highway bringing the direction in which the train approached practically to the rear of the plaintiff as he approached the south-bound track, nor to the silence of the signal bell. If box cars, some of them refrigerator cars, stood on three or four of the freight tracks and in the street within 15 or 20 feet of the traveled portion of the highway as testified to by the plaintiff, or within 15 feet of the north line of the traveled highway as testified to by one of his witnesses, it is reasonable to infer, and as the witnesses testified, that such cars obstructed the view of trains approaching from the north on the south-bound track until the cars on the last freight track were passed. The plaintiff testified that as soon as he passed such cars he looked to his left, then to his right or to the north or northwest, and neither saw nor heard the approaching train. He further testified that because of the angle at which the tracks crossed the highway, he, seated in his motortruck at the wheel and by turning his head without also turning his body, could see in the direction in which the train approached a distance of about 150 feet and that no train was then in view, and that the nearer he approached the south-bound track the more was the direction from which the train approached to the rear of him and that turning his body clear around to look farther up the track was liable to cause loss of control of the motortruck. To that effect

was also the testimony of his witnesses. We are now asked to say that such testimony as matter law is contrary to physical facts. We may not do that. That the acute angle caused some hindrance or interference in looking up the track, and seeing the approach of a train and rendering the discovery of it from such direction more difficult than if the tracks had crossed the highway in a direction substantially east and west, must be conceded. To what extent the situation so interfered was a matter of evidence not of law. We cannot try that out without making jurors of ourselves. The distance, from the last rail of the freight track on which stood a train of box cars to the first rail of the south-bound track, was about 25 or 27 feet. The plaintiff testifying that as soon as he passed such cars and looked to his left and then to his right and could see up the south-bound track a distance of only about 150 feet and saw no train, we cannot say such testimony in view of the surroundings is so clearly against physical facts as to justify a repudiation of it as a matter of law. Just at what particular or exact point after he passed such cars he looked up the south-bound track was and could be stated or testified to only approximately and not with exactness in feet or inches. He testified he did so as soon as he passed the box cars. So, too, when he testified he could see up the track only about 150 feet, that also was only approximate. The plaintiff, however, had the right to go to the jury on such estimates of distance. We may thus assume that the plaintiff at the point he looked could see up the track only about 150 feet. Should we take the testimony most favorable to the plaintiff as to the speed of the train we may further assume it was traveling at a speed of sixty miles an hour. If the plaintiff looked up the track as soon as he passed the box cars, the train was then farther up the track than 150 feet and not in sight, for traveling at the stated speed it would travel 150 feet in about 1.7 seconds and thus would have crossed the intersection before the plaintiff reached the south-bound track traveling a distance of 25 or 27 feet at five or six

miles per hour. Of course, that is only relative and may not be taken with arithmetical exactness.

In this connection it is also asserted that if the plaintiff looked when he said he looked and saw no approaching train, he as matter of law was required to again look before entering upon or so near the south-bound track as to be struck by the train. But in such particular we are here dealing not even in minutes, only in seconds, with only a few seconds at that, for the plaintiff traveling 25 feet at five or six miles an hour would require only about 2.8 seconds to reach the south-bound track. To say that the plaintiff having looked and saw no train was within three seconds as matter of law required to again look before attempting to pass over the south-bound track when to do so necessitated him either to stop, or turn his body clear around, for then, and as shown by the testimony, the view up the track was practically at his back, is in effect to say that the plaintiff was not justified in placing any reliance whatever on the silence of the signal bell and that he as matter of law was required to stop, look, and listen before attempting to drive over either the north or the south-bound main track.

That the signal bell was silent is, as we think, a material and relevant factor in considering the question of contributory negligence. In the recent case of *Crowley* v. *Chicago, B & Q. R. Co.*, 204 Iowa 1385, 213 N. W. 403, a verdict was directed in favor of the railway company on the ground of contributory negligence. The ruling was reversed and a new trial granted, the Supreme Court holding the question to be one of fact for the jury. There the silence of a signal bell was directly involved and seemingly was the turning point in the case, for the court there observed that were it not for the fact that the automatic signaling device maintained by the railway company indicated that the way was clear and that the appellant relied thereon, the case would present less difficulty. In reviewing the question and considering many cases from different jurisdictions, the court further observed that the cases were not in entire ac-

cord as to the extent which a traveler about to cross a railway track had the right to rely upon a signaling device, some courts viewing the failure of an automatic signal device to give the intended warning as a mere act of negligence, while other courts holding that the fact that the device gave no warning of an approaching train was a circumstance to be considered on the question of the traveler's exercise of due care and that the question of his negligence was one of fact for the jury. The court further observed that it could not agree with those cases holding that the silence of a signal bell was not at all to be taken into account in determining whether the traveler exercised due care, and that if the silence of such a device was to be given any effect in determining the question of contributory negligence it was apparent its tendency was to present a jury question; that where a traveler knew of an automatic signaling device at a crossing, the failure of it to work naturally induced the traveler to believe the crossing free and clear from danger, and that a jury had a right to take such fact into consideration in determining whether such traveler exercised ordinary care in attempting to go upon the crossing; and that the inactivity of a signaling device indicated that no train was approaching, *and that almost without exception the authorities agreed that the traveler had a right to rely to some extent on such fact* and that it was a circumstance to be taken into account in determining whether the traveler exercised due care. The case is also reported in 53 A. L. R., where, at page 973, there are extensive annotations on the subject and where numerous cases from many different jurisdictions are cited and reviewed. The anotator states the general rule to be that where a railroad company voluntarily or by statute maintains at a crossing a signaling device to give warning of the approach of trains, the failure of the device to operate in a particular instance constitutes negligence on the part of the railroad company; that the decisions are not in accord *as to the extent* to which a traveler may rely on the indication of safety which the silence

of a signaling device at a crossing implies; that in one line of cases it is held a traveler has no right to rely *solely* on the silence of a signal device and is as a matter of law guilty of contributory negligence in proceeding to cross the track *without taking further precautions for his own safety;* but that in a longer line of decisions it is held that while the failure of a signaling device at a railroad crossing to operate and warn the approach of a train does not *entirely* relieve a traveler from his duty to look and listen for an approaching train, nevertheless the traveler *may rely to some extent* on the apparent safety implied from the silence of the signal device, and that *such silence is a circumstance to be taken into consideration by the jury on the issue of contributory negligence.* There is no marked conflict in the decisions. A number of them hold that a traveler approaching and attempting to drive over a crossing may not wholly or solely rely on the silence or failure to operate of an automatic signal device and drive over the crossing without taking any other or further precautions for his own safety and escape the charge of contributory negligence. We are in accord with such holding. On the other hand, the authorities, and as stated by the Iowa court, without substantial discord hold that the traveler, however, may to some extent rely on the silence or failure to operate of a signaling device or failure to operate of a signaling device and that such silence or failure may well lessen *the extent* of his otherwise imperative duty to look and listen and the amount of care to be exercised by him, analogous to open gates or the absence of customary flagmen or watchmen. Though, as is contended, such a signaling device is maintained at a crossing as an additional precaution and warning of danger and of approaching trains, yet to say a traveler is not permitted to pay any attention to it, may not to *any extent* rely on it in approaching and driving over a crossing, and is required to exercise the same vigilance and degree of care required of him as though no such device was maintained at the crossing, is to establish a rule contrary to the decided

weight of judicial authority and against conduct of the ordinarily prudent traveler.

In a more recent case, *Wabash Ry. Co.* v. *Walczak*, 49 F. (2d) 763, 764, decided in May, 1931, by the Circuit Court of Appeals, and where the question was again presented to what extent a traveler may rely upon the failure of a signaling device to operate as bearing on the question of contributory negligence, the court said: "This court has repeatedly held that open gates, the absence of a customary watchman, or the failure of crossing signal to operate, lessened the otherwise imperative duty of the traveler to stop, look, and listen, and was the practical equivalent of an invitation to cross," and that due care did not require the traveler to exercise that same degree of care in crossing "each of the series of tracks" as he was required to exercise before he entered the place of known danger, or even such as he would otherwise have been required to exercise while crossing, had he not in effect been invited to proceed by the failure of the signaling device to operate; and that thus the question of contributory negligence was one of fact for the jury.

So, too, in the case of *Detroit United Ry.* v. *Weintrobe* (C. C. A) 259 F. 64, 66, where the court said:

"If, then, the case may be considered with reference to the northbound bell alone, it presents a situation where a warning bell, provided and customarily operated by the railroad company, is silent as the traveler approaches the crossing; and its silence is therefore an indication that no train is approaching, and in the nature of an invitation to cross; and this situation operates, as does an open gate or an absent flagman, to minimize the otherwise more imperative duty of looking and listening, and to make the issue of contributory negligence one of disputable inference. We have applied this rule with reference to gates and flagmen, we see no reason why it does not apply to warning bells, and it has been so held," citing cases.

Such a holding is not, as the federal courts say, in conflict with the case of *Baltimore & O. R. Co.* v. *Goodman*, 275 U. S. 66, 48 S. Ct. 24, 72 L. Ed. 167, 56 A. L. R. 645,

for the stated reason that open gates, or the failure of signaling devices to operate, was not a factor in such case and upon that ground was it distinguished. *Wabash Ry. Co.* v. *Walczak,* supra; *Teague* v. *St. Louis S. W. Ry. Co.* ('C. C. A.) 36 F. (2d) 217; *Canadian Pac. Ry. Co.* v. *Slayton* (C. C. A.) 29 F. (2d) 687. In the Teague Case a verdict on reliance of the Goodman Case was directed in the court below in favor of the railway company, which by the Circuit Court of Appeals was reversed, and a writ of certiorari denied by the Supreme Court of the United States, *St. Louis S. W. Ry. Co.* v. *Teague,* 281 U. S. 733, 50 S. Ct. 248, 74 L. Ed. 1149. So, too, in the case of *Erie R. Co.* v. *Stewart* (C. C. A.) 40 F. (2d) 855, where it was held that the question was one of fact for the jury and a writ of certiorari denied, 282 U. S. 843, 51 S. Ct. 34, 75 L. Ed. 748.

We are inclined to hold, and do hold, with the cases heretofore referred to and cases cited in the annotations in 53 A. L. R. 973, supra, that where an automatic or other signaling device is maintained by a railway company at a public crossing to give warning of the approach of engines and trains, one approaching and atempting to pass over the crossing in a vehicle has the right to rely, *not solely or entirely,* but *to some extent,* on the signaling device, and that its failure to operate in a given case may ordinarily be regarded as an implied invitation to pass, and unless the traveler before he entered upon the crossing and attempted to pass over it failed to look and listen when to do so would have discovered the approaching train in time to have avoided the collision, or in view of the surroundings it was conclusively shown he had not otherwise used due and ordinary care, the case should be submitted to the jury. We are in accord with the views expressed by the Iowa and other courts that in nearly all of the cases the rule is stated to be that a traveler entering upon a crossing has the right to rely to *some extent* on the inactivity of a signaling device indicating that no train is approaching, and that such fact is a circumstance to be taken into ac-

count in determining whether the traveler exercised due care; and as further stated by the Iowa court, that if the silence of such a device is to be given effect in determining the question of contributory negligence, its tendency is to present a jury question. The case here is not one where by the record it is shown the traveler *solely* or *entirely* relied on the signal bell, nor where he before entering upon the crossing and attempting to pass over it failed to look and listen, or where by looking and listening he could have discovered the approaching train before entering upon and attempting to pass over the crossing as in the answer of the defendant alleged. While prior decisions of this court show that we, in denying recovery in railway crossing cases on the ground of contributory negligence, have gone about as far as most cases in other jurisdictions, and farther than some, yet, in the main, we have adhered to the general rule that to a large extent each case is dependent upon and governed by its own facts, and whatever language or statements may be used or made in the cases must be considered with respect to and in view of the particular facts of the case. In view here of the complicated conditions, the silence of the signaling device, the obstructed view, that notwithstanding all the occupants of the truck were on the lookout for approaching trains and discovered none until the train was upon them, and the suddenness by which the plaintiff was confronted by the rapidly moving train, the care or the want of it exercised by the plaintiff is not to be determined by arithmetical calculations as to what within a few seconds before he attempted to enter the south-bound track, under normal conditions could or could not have been seen, or the distance in which the truck, uninfluenced by the surroundings, could have been stopped.

It is unnecessary to express an opinion and we express none, as to what our holding would be were the fact of the failure of the signal device to operate not in the case. It is enough that we hold as we do that upon all the facts in evidence as heretofore referred to including the silence of the

signal bell the case ought to have been submitted to the jury and that the court erred in not doing so. This, as far as we have been advised, is the first case in this jurisdiction involving the element or factor of the failure of a signaling device to operate or of open gates or other similar devices as bearing on the question of contributory negligence; at least, we have not been referred to any such case by either party.

The judgment of the court below is reversed, the case reinstated, and remanded for a new trial. Costs to the appellant.

CHERRY, C. J., and EPHRAIM HANSON, J., concur.

FOLLAND, J. (dissenting).

The decisive question on this appeal is whether or not the evidence which is without substantial conflict, shows, on the part of the plaintiff, contributory negligence as a matter of law, particularly in view of testimony to the the effect that the automatic electric crossing signal bell was not ringing at the time. The prevailing opinion states fully the general principles of law, to which I give full concurrence, with respect to the care and vigilance required of one aproaching and driving over a railroad crossing. Applying these general principles to the facts, the conclusion seems irresistible that plaintiff was guilty of contributory negligence as matter of law.

The accident happened between 7:30 and 8 o'clock in the morning. It was full daylight with clear atmospheric conditions. As soon as plaintiff passed the freight cars, he says he looked first to the south and then to the north but saw the track only for a distance of 150 feet to the north and did not see the train. After plaintiff had passed the box cars standing on freight tracks Nos. 1 and 2, he had a clear view to the north for a distance of at least 900 feet along the south-bound main line track. He estimated a distance of 27 feet between the west rail of No. 1 freight track and

the east rail of the south-bound main line track. This gave him at least 25 feet within which he could have looked to the north, discovered the on-coming train, and brought his truck to a complete stop in time to have avoided the collision; that is if he had looked to the north with such attentiveness as to see what was plainly within the range of his vision. At the speed at which he was driving he said he could stop within from 3 to 6 feet. Later he said automotive engineers fixed this distance at from 6 to 12 feet. In either event there was sufficient distance within which he could have brought his truck to a stop had he seen the train at the time he says he looked. It will be seen that in driving his truck at the rate of five miles per hour, his lowest estimate, plaintiff would travel 7.3 feet per second, so that he would cover the distance of 25 feet in approximately 3½ seconds. The train, if traveling at the rate of sixty miles per hour, the highest estimate, would move 88 feet per second, and in 3½ seconds would travel 308 feet. At the time plaintiff passed the string of freight cars and could have commanded a clear view of at least 900 feet of the main line track extending to the north, the train must have been not more than approximately 308 feet distant from the crossing. Any computation using a lower rate of speed for the train and a higher rate of speed for the truck would place the train closer to the intersection at the time plaintiff says he looked to the north. Reasonable or due care requires that in looking the plaintiff should have brought within his range of vision more of the main line track than merely 150 feet. He could have seen that far without turning his head or his body. His excuse is that to have looked farther to the north would have required him to turn his body. He cannot free himself from negligence merely because he did not care to turn his head or his body in the direction from which a train might be expected, when as a matter of fact the train was then about 300 feet away approaching the crossing at a high rate of speed and within plain view if he had taken the trouble to look. His companion sitting in the seat with him saw the train and shouted, "My

God, the train." A very significant piece of testimony is that of Hagburg, who was riding in the box of the truck. He testified that when Bergstrom shouted the rear part of the truck "was just pulling off the rails of the last track that had freight cars on it, that is on the main line—one of the main lines. We were pulling on to the first one of the main lines." This was approximately the point where plaintiff said he looked and saw nothing. Hagburg's estimate of location is confirmed by the fact that immediately after Bergstrom shouted, Hagburg called to his stepson to jump, and then placed his hands on the side of the car, vaulted over the side, and landed clear of the first rail of the north-bound main line. When he rose up the freight cars were directly in front of him. He landed between freight track No. 1 and the northbound main line track, or approximately 25 feet from the south-bound main line track. The inference is rather convincing that if plaintiff had been driving at such a rate of speed that he could have stopped from within 6 to 12 feet he could, after Bergstrom's warning, have stopped his truck before colliding with the locomotive. A careful reading of the evidence leads me to the conclusion that plaintiff drove his truck in front of the on-coming train while entirely heedless and indifferent to his own safety and the safety of others. If he looked at all to the north, he did it in such an indifferent and inadequate manner as not to see the train which was plainly within the range of vision. His conduct was nothing short of gross negligence. There is no showing made by him that he was suffering from a stiff neck or any other infirmity which made it difficult or impossible for him to turn his head or even his body so as to see what was plainly within view. It is common knowledge that in crossing railroad tracks at such an angle as here one need not turn his head far to command a view of the entire 900 feet of main line track upon which the on-coming train was traveling. It will not do for the plaintiff to say that he did not look farther to the north because he would have had to turn his body. Plaintiff attempts to excuse his

conduct by saying that the road was full of ruts. If this were true, it would not excuse such rash conduct as to drive in front of an on-coming train without taking the trouble to look farther up the track than 150 feet. A number of photographs produced by defendant were introduced in evidence, without objection, after plaintiff's witnesses had testified they fairly disclosed the conditions at the crossing at the time of the accident. These photographs, which were taken on the morning of the accident, show a relatively even roadway, such a one as could be easily and safely traversed by automobiles. The law applicable is well stated in *Butler* v. *Payne*, 59 Utah 383, 203 P. 869, 870, wherein the court said:

"One or two of plaintiff's witnesses testified to the effect that one would have to be within a very few feet of the crossing before he could see along the track in a northerly direction or see a train approaching. Admitting this to be true, which is impossible if the photographs referred to reflect the actual conditions, it was the duty of the deceased, in the exercise of ordinary care, to look for an approaching train the first opportunity he had before attempting to cross the track. As suggested by the trial court, in passing upon the motion for a nonsuit, a person traveling in an automobile can without danger approach much closer to a railroad track than one driving a vehicle drawn by horses.

"We have examined the evidence with scrupulous care, and have reached the conclusion that if deceased had exercised ordinary care in looking for an approaching train he would have seen the train with which he colided in time to avoid the accident. This being the case, it becomes entirely immaterial whether or not he could have heard the train, or whether or not the defendant's servants or agents were negligent in its operation."

And in *Lawrence* v. *Denver & R. G. Ry.*, 52 Utah 414, 174 P. 817, 820, as follows:

"A person before attempting to cross a railroad track, and when an approaching train is in full view, is chargeable with seeing what he could have seen if he had looked, and with hearing what he would have heard if he had listened. In otherwords, where he apparently looks and listens, but does not see or hear the approaching train, it will be presumed that he did not look or listen at all, or, if he did, that he did not heed what he saw or heard."

To similar effect is the recent case of *Polly* v. *Oregon S. L. R. Co.* (Idaho) 6 P. (2d) 478, 480, wherein it is said:

"Where a person approaching a railway crossing does not look when he is in a place where he can see if he looks, or looks but does not see, and nothing diverts his attention, he is guilty of contributory negligence."

Plaintiff's disinclination to turn his body in order to look is no adequate excuse. The Supreme Court of Kansas, in *Reader* v. *Atchison, T. & S. F. Ry. Co.*, 112 Kan. 402, 210 P. 1112, 1113, said:

"The fact that the plaintiff would have been obliged to turn in his seat and look backward is of no consequence. A traveler approaching a railway crossing must be vigilant in trying to see."

The theory of the prevailing opinion, however, is that notwithstanding plaintiff's negligence, if any is disclosed by the evidence, the issue of contributory negligence must be submitted to the jury because of testimony to the effect that the mechanical automatic crossing bell was not working and by its silence it gave plaintiff an implied invitation to cross. It is there said that the failure of the signaling device to operate and warn of the approach of the train does not entirely relieve the traveler of his duty to look and listen for an approaching train, yet, nevertheless, the traveler may rely to a certain extent on the safety implied from the silence of the signal, and that such silence of the signal is a circumstance to be taken into consideration by the jury on the issue of contributory negligence. The question of the extent to which a traveler may rely on the indication of safety, which the silence of a signaling device at a railroad crossing implies is presented now for the first time in this court. The decided cases are not in full accord on the subject. In the prevailing opinion the two rules set forth in 53 A. L. R. 973 under the heading "Failure of signaling device at crossing to operate as affecting liability of railroad for injury" are referred to at length and the opinion follows

the rule said to be supported by the longer line of cases. I prefer that we adopt the other rule, that a traveler has no right to rely *solely* on the silence of the signal and is as a matter of law guilty of contributory negligence in proceeding to cross the track without taking further precautions for his own safety. I am unwilling to say that a railroad by putting in automatic signaling devices at street crossings increases its responsibility and liability to the extent implied by the other rule or that the silence of such a bell is an implied invitation to the traveler to cross railroad tracks without taking the ordinary precautions and exercising ordinary care which includes the requirement that he shall look and listen. The object of putting in electric bells is to promote safety rather than to increase railroad liability. *Jacobs* v. *Atchison, T. & S. F. Ry. Co.*, 97 Kan. 247, 154 P. 1023, L. R. A. 1916D, 783, Ann. Cas. 1918D, 384; *Gunby* v. *Colorado & S. R. Co.*, 77 Colo. 225, 235 P. 566. In *Atchison, T. & S. F. Ry. Co.* v. *McNulty*, decided by the Circuit Court of Appeals (8th Cir.) 285 F. 97, 100, affirmed in the Supreme Court of the United States by denial of certiorari, 262 U. S. 746, 43 S. Ct. 521, 67 L. Ed. 1212, the court said:

"Neither open gates nor failure of the railway company to give signals at a railway crossing relieves one about to cross the tracks from the duty to use due care to look and listen for an approaching train."

See other cases in note, 53 A. L. R. 976.

Any substantial relaxation from the imperative requirement on travelers to look and listen, in the exercise of ordinary care, at railroad crossings where there are automatic signaling devices, will tend, I fear, to increase rather than to decrease the number of automobile accidents. The evidence in the present case indicates not so much that the electrical device was out of order or not operating as that the plaintiff and his witnesses did not hear the bell. True, plaintiff and his witnesses said it was not ringing. Hag-

burg, however, said that upon hearing Bergstrom shout he then heard the locomotive whistle or the crossing bell. Later he said he was not sure whether the bell he heard was the crossing bell or the locomotive bell. There is no evidence that the automatic device was out of order or that defendant negligently or carelessly permitted it to be or remain out of repair. The case at best rests on testimony of a mere momentary failure of operation.

The decision in *Crowley* v. *Chicago, B. & Q. R. R. Co.*, 204 Iowa 1385, 213 N. W. 403, 407, 53 A. L. R. 964, cited and relied on in the prevailing opinion, does not go quite so far as I think the prevailing opinon does in this case, for there it was said with reference to the silence of a mechaical signaling device:

"Nor are we prepared to say that its presence must of necessity make the question of his contributory negligence in all cases one for the jury. If the silence of such a device is to be given any effect in determining the question of contributory negligence, it is apparent its tendency would be to present a jury question. But, as we have frequently observed, whether contributory negligence is a question of law for the court or of fact for the jury must be determined on the facts of the particular case."

If it be conceded that the presence of a mechanical crossing signal permits the traveler to relax to some extent the degree of vigilance he would otherwise be required to exercise, that does not mean that he may cast aside all caution and care and proceed in the face of obvious impending danger which by the exercise of even slight care he could have avoided. The undisputed facts here show, I think conclusively, that had plaintiff exercised even the slightest degree of care for his own safety the accident could have been avoided.

If there is any discretion whatsoever left in the court to determine the question of contributory negligence, in the face of testimony that the automatic signaling device was not ringing, then I think under the facts disclosed by the

evidence the trial court was right in withholding this case from the jury.

ELIAS HANSEN, J.

I concur in the views expressed by Mr. Justice FOLLAND.