DRUMMOND v. UNION PAC. R. CO.

No. 6980. Decided February 20, 1947. (177 P. 2d 903.)

See 52 C. J. Railroads, sec. 1889; 44 Am. Jur. 815. Failure of signaling device at crossing to operate as affecting liability of railroad company for injury, notes, 53 A. L. R. 973; 99 A. L. R. 729.

*Rawlings, Wallace & Black, Wayne L. Black,* and *Woodrow D. White,* all of Salt Lake City, for appellant.

*A. U. Miner, Bryan P. Leverich, H. B. Thompson,* and *M. J. Bronson,* all of Salt Lake City, for respondent.

LATIMER, Justice.

This is an action to recover damages for personal injuries and property damage arising out of a collision between an automobile driven by plaintiff, and a train operated by defendant.

The accident happened on the 21st day of October, 1943, at about 10:00 o'clock in the morning. The weather was

cloudy but at the time of the collision visibility was good. Mrs. Drummond, the plaintiff, left her home at 1753 Center Avenue, Ogden, Utah, to proceed to the main shopping district of town. Her house is located 116.5 feet south of the place where the Oregon Short Line (Union Pacific) Railroad Co. track intersects Center Avenue, the place where the accident occurred. She had resided in this house for approximately eight years before the accident and had gone over the crossing many times. She was familiar with the physical surroundings, and with the fact that a number of trains travelled the route daily and at irregular intervals. On the morning in question the plaintiff backed out of her driveway to Center Avenue, from where she started to drive north. From this point she could see 300 feet down the railroad tracks to the southeast. She continued north on Center Avenue until she reached a point approximately 40 to 45 feet south of the railroad track, there being only one track involved at this intersection. Here she stopped and looked in both directions. From this point she could see down the track according to her testimony, 80 to 100 feet. However, the exhibits introduced and the evidence of other witnesses indicate an unobstructed view for approximately 400 feet.

If plaintiff's vision was obstructed beyond the 100 feet estimate, it was because of weeds, sunflowers, and trees, which, according to plaintiff's evidence were pretty thick. The undisputed evidence is that the weeds and sunflowers were from five to seven feet high, and were down off the gravelled track bed. The track had been graded up and was about five feet above the surrounding land. This would place the weeds on ground below the track, so that if all weeds were seven feet high they would extend only a short distance above the level of the track. If they were five feet high, the top of the rails would be approximately level with the top of the weeds. Sitting in a car, plaintiff would be some four to five feet above the ground, and as she drove up the 40 foot incline to the tracks the weeds would interfere less with her vision to the southeast. Railroad engines and cars are 13 to 14 feet high, and the weeds were not growing

closer than 80 to 100 feet south of the intersection. Thus, only the lower part of the engine and cars would be obscured from plaintiff's vision, from the time she left her home until the collision. The most substantial obstacle to interfere with her vision were some trees that were growing approximately 400 feet southeast of the intersection.

Center Avenue as it goes over the tracks narrows down so that according to plaintiff, it is just wide enough for one car, and at the time of the collision was rough and full of ruts. The railroad right of way runs northwesterly and southeasterly, and as the train approached from the south it was coming towards the plaintiff from her right rear at approximately a 45 degree angle. The railroad maintained an automatic signal bell at this crossing, but according to plaintiff it did not ring, and so failed to warn her of the approach of the train.

Plaintiff stopped just opposite or alongside the signal bell, with the car windows down, and although she had heard the bell ring on many other occasions, she was positive the bell was not ringing this time.

An Ogden City Ordinance required that all trains operating within the city limits be limited to a speed of 10 M. P. H. Evidence introduced by the plaintiff established a violation of this ordinance. At the close of plaintiff's case, defendant made a motion for non-suit based on the grounds of contributory negligence of the plaintiff and the learned trial court granted the motion and entered judgment accordingly.

Plaintiff appeals from the judgment as rendered, and makes seven assignments of error. The last six can be grouped together as they all go to the refusal of the trial court to admit certain testimony into the record. It is not necessary for the court to treat these assignments as they all go either to the negligence of the defendant or to facts otherwise proven. For the purpose of this decision, it will be assumed that negligence on the part of the defendant was established. Additional evidence on this phase of the case would therefore only be cumulative, and whether or

not the court erred in refusing to admit the proffered testimony would be of no consequence.

The only problem requiring discussion is whether or not the court rightly granted the motion for non-suit, and on this matter the judgment must stand or fall.

Both parties agree that a traveller upon the highway has a right to rely to some extent upon the signal device at the crossing, but cannot be entirely relieved from his duty to look and listen for approaching trains. See *Pippy* v. *Oregon Short Line Ry. Co.*, 79 Utah 439, 11 P. 2d 305.

Applied to the facts in this case, Mrs. Drummond had a right to rely to some extent upon the failure of the bell to warn her. Such being the case, it becomes necessary to determine whether or not she fulfilled the other requirements of the rule cited above. That is, did she look and listen to the same extent that a reasonably prudent person would do under similar circumstances?

Appellant places great reliance on *Pippy* v. *Oregon Short Line R. Co.*, supra, and it is therefore desirable to quote the rule enunciated by that case and then to determine its application to the facts of both cases (79 Utah at page 461, 11 P. 2d at page 313):

"We are inclined to hold, and do hold, with the cases heretofore referred to and cases cited in the annotations in 53 A. L. R. 973, supra, that where an automatic or other signaling device is maintained by a railway company at a public crossing to give warning of the approach of engines and trains, one approaching and attempting to pass over the crossing in a vehicle has the right to rely, *not solely or entirely*, but *to some extent*, on the signaling device, and that its failure to operate in a given case may ordinarily be regarded as an implied invitation to pass, and unless the traveler before he entered upon the crossing and attempted to pass over it failed to look and listen when to do so would have discovered the approaching train in time to have avoided the collision, or in view of the surroundings it was conclusively shown he had not otherwise used due and ordinary care, the case should be submitted to the jury. We are in accord with the views expressed by the Iowa and other courts that in nearly all of the cases the rule is stated to be that a traveler entering upon a crossing has the right to rely to *some extent* on the inactivity of a signaling device indicating that no train is approaching, and that such fact is

a circumstance to be taken into account in determining whether the traveler exercised due care; and as further stated by the Iowa court, that if the silence of such a device is to be given effect in determining the question of contributory negligence, its tendency is to present a jury question. The case here is not one where by the record it is shown the traveler solely or entirely relied on the signal bell, nor where he before entering upon the crossing and attempting to pass over it failed to look and listen, or where by looking and listening he could have discovered the approaching train before entering upon and attempting to pass over the crossing as in the answer of the defendant alleged   *   *   *."

An inspection of the facts in the *Pippy* case will disclose that there were eight parallel tracks over which plaintiff had to travel. Two of the tracks were main line, and the other six were storage and freight tracks. There were box cars standing on these other tracks so close to the main track that it was impossible to see to the northward, the direction from which the train was coming, until the plaintiff passed the box cars standing on the track next to the main line. He was then within 27 feet of the main line on which the train was coming. When he did pass this last string of cars, he could see 100 to 150 feet up to the northward. There were also freight cars blocking his view to the southward, and it was necessary that he watch for trains which might come from either direction. The bell was not ringing and no warning was given of the approach of the train, which was coming from the northward at the rate of 50 to 60 miles per hour. The tracks all crossed the highway at less than a 45 degree angle so the train approached plaintiff from his right rear. The crossing was rough, with wooden planks placed alongside the rails, and the rails stuck up above the level of these planks so that it was necessary to zig-zag the car while crossing them, to prevent being shunted up or down the tracks.

The difference between the facts of the two cases is readily apparent. By way of contrast, in the instant case there was only one single track, so plaintiff was not faced with the possibility of trains coming from both directions at once. The closest obstruction, in the instant case, if it

can be classed as such, consisted of weeds, and they were some 80 to 100 feet south of the crossing and growing on ground below the level of the track, so that they could, at most, have obstructed plaintiff's view of only the lower portion of the train. In the *Pippy* case the height of the box cars prevented the driver from seeing any portion of the train. In the case at bar the train was travelling not more than 25 to 30 M. P. H., so the reaction time afforded the plaintiff was much greater. From the time plaintiff left her home until the collision, she could have observed the approach of the train at any point within 300 feet southeast of the intersection. The possibility of plaintiff's car being shunted down the track into a position of much greater danger, as in the *Pippy* case, was absent. The only elements present to distract plaintiff's attention in this case were the ruts in the road and the narrowness of it. When she stopped forty feet from the crossing, these were of no consequence. Finally, she had an opportunity, before crossing the track, to stop in a place which afforded her both safety and an opportunity to look.

A careful inspection of the two cases leads this court to believe the only similarity in the facts is that in both actions the signal bell failed to ring, and the train approached the crossing from the plaintiff's right rear, requiring the driver of each vehicle involved to turn his or her head farther to the right in order to see the oncoming train than would have been necessary at a right-angle crossing.

As stated in the prevailing opinion of the *Pippy Case* (79 Utah at pages 453, 454, 11 P. 2d at page 311) :

"* * * [This case] is not one where the traveler approached the crossing and attempted to drive over it without looking and listening, nor is it one where the view of approaching trains was unobstructed. It is one of rather complicated conditions as shown by the testimony referred to. The plaintiff testified, and so did his companions in the rear of the truck, that as they approached the crossing and before entering upon it they looked and listened for approaching trains and neither saw nor heard any. Because of box cars on the freight tracks and of the curve, their view to the north or northwest was obstructed and prevented; and if the train which struck the motortruck was

running between fifty and sixty miles an hour, as on the evidence we must assume it did, the train was a considerable distance beyond the curve and not in view when the plaintiff approached and entered upon the crossing. Thus, neither seeing nor hearing any train and watching the signal bell which was silent in front of them on the other side of the crossing, they entered upon it. But the exercise of care by the plaintiff did not rest at that. He testified that he watched, looked, and listened as he drove over each railway track, but the box cars on the freight tracks shut off his view of the main line to the north or northwest, and thus he did not see nor hear the approach of the train. In that he is corroborated by his companions surviving the accident. In front of him was still the silent signal bell inviting him on. As soon as he passed the box cars on the last freight track and while approaching the track of the northbound line, he, as he testified, looked to his left and then to his right, to the north or northwest, and neither saw nor heard a train approaching on either the north-bound or the south-bound mainline, the south-bound line on which the train approached lying southwesterly of the north-bound line; and having so looked and neither hearing nor seeing the approach of any train, and the signal bell still silent, he, without again looking, drove over the north-bound track and approached near or partly on the south-bound track when he was struck by the train from the north or northwest on that track.  *   *   *"

While distances and times are only relative, they assist in explaining some of the questionable elements in a case involving moving objects and estimates of individual witnesses. Taking the estimates made on the speed of the train, in this case, the highest claimed by the plaintiff was 35 M. P. H., and the lowest testified to was 20 M. P. H. From the time the train cleared the trees, or passed the block signal 400 feet from the intersection, until it reached the crossing, there would be a lapse of 8 to 13.8 seconds. If plaintiff were travelling 5 M. P. H., she would be from 58 to 100 feet away from the crossing at the time the train first came into view; and if she were travelling the average speed of 2½ M. P. H., as claimed by her counsel, she would be 29 to 50 feet from the crossing when the train passed the block signal a little more than 400 feet down the track.

As previously indicated, it is not intended to bind plaintiff by mathematical certainty. It is intended only to show that the train was within her field of vision for a sufficient

time to permit her to have seen it if she had looked, or looking, had heeded its presence. Her reaction time was not reduced to the split-second, where the mental processes are sometimes unable to function fast enough, or at all.

Furthermore, giving plaintiff the usual percentage for margin of error, it is impossible to escape the conclusion that the train could have been observed by her at the time she stopped and claimed to have looked. While it is true plaintiff testified she looked up the track as far as she could see, and no train was in sight, this is a variance from the facts as they existed. Her contention in this regard is answered by the authorities sustaining the proposition of law that a person before attempting to cross a railroad track when an approaching train is in full view, is charged with having seen what he could have seen, had he looked. See *Lawrence* v. *Denver & R. G. R. Co.*, 52 Utah 414, 174 P. 817.

When the speed at which plaintiff claims to have been travelling is considered in connection with plaintiff's evidence that the automobile brakes had just been repaired and were in such condition that she could have stopped instantly, the conclusion is inescapable that plaintiff either did not look, or having looked she did not see, or having seen, she did not heed what she saw.

Attempting to avoid this conclusion, plaintiff presents the argument that the roughness and narrowness of the approach to the track distracted her attention, and that the direction from which the train approached the crossing made it difficult to see. Neither one nor both of these conditions would be enough to relieve plaintiff of her duty to look and listen and to make reasonably certain she could cross with safety.

Treating the last of these arguments first, the rule governing a traveller's duty and conduct when approaching a railroad track which crosses the highway diagonally or at an angle, is clearly stated by the Supreme Court of Kansas in the case of *Reader* v. *Atchison, T. & S. F. R. Co.*, 112 Kan. 402, 210 P. 1112, at page 1113:

"The fact that the plaintiff would have been obliged to turn in his seat and look backward is of no consequence. A traveler approaching a railway crossing must be vigilant in trying to see. *Railway Co.* v. *Jenkins*, 74 Kan. 487, 488, 87 P. 702. Ordinary prudence requires that an automobile driver use his faculty of sight near the track, where it will be of most benefit to him. *Gage* v. *Atchison, T. & S. F. R. Co.*, 91 Kan. 253, 258, 137 P. 938, Ann. Cas. 1915B, 410. The time to look is when he is about to cross. That is the time when he is about to encounter the danger portended by a railway crossing, and it is not enough that he look at a point some distance from the crossing, when looking on nearer approach would reveal danger. *Chicago, R. I. & P. R. Co.* v. *Wheeler*, 80 Kan. 187, 191, 101 P. 1001; *Beech* v. [*Missouri, K. & T.*] *R. Co.*, 85 Kan. 90, 95, 116 P. 213.  *  *  *"

In the case at bar one need not go so far as the Kansas case. When the plaintiff stopped and looked, she made no claim she didn't look down the track. Her statement was that she did look down the track but could not see clearly because of the weeds. The angle of the track to the highway did not require her to turn very far. She stopped for the purpose of looking down the track, and if the course of the road bed made it a little more difficult to see, then plaintiff was charged with the duty of turning far enough to see that a train was not coming and that she could drive onto and across the tracks with safety. There would be little sense in making the effort to look if it were not done for this purpose.

In the *Pippy Case* the acute angle, "less than 45 degrees" of the crossing was referred to because the position of the box cars on the tracks other than the mainline was such that the angle of approach of the train increased the dead space in which the travellers' vision was obscured. Not that the driver was not required to look towards the rear but his opportunity of looking in that direction was thereby considerably reduced, because of the proximity of the cars. If we are correct on the lack of interference with plaintiff's vision in this case, then the only effect of the angle of approach is to require plaintiff, under the present state of facts, to have turned her head far enough to the right to get a clear view of the track for a distance sufficient to

permit her to make the crossing in safety. To require less would be to eliminate the necessity for looking at all. There being no purpose in looking unless the direction of sight is such that the driver will discover the presence of a train, if one is in fact coming. To say a person were only required to look to the front or to the side would, in fact, be saying that the duty to look would vary with the angle of approach. The duty to look doesn't vary. In fact, the effort to see should be greater when the train is aproaching from the rear.

Plaintiff made no claim that she did not look down the track because it was off to the right rear. On the contrary she claims to have made this effort and to have looked. Such being the case, her duty to see was in no way diminished by the position of the train with reference to her. She was still bound to see what was there to be seen.

Plaintiff did not allege the condition of the crossing as one of the grounds of negligence. She did, however, prove that the approach to it was rough and the travelled portion narrow. Evidence on these conditions was admitted by the court for the purpose of showing, in substance, that it was necessary for plaintiff to divide her attentions between the road and the railroad crossing. Even though these hazards were present, they still are not of sufficient importance to make a jury question of whether or not plaintiff exercised due care or to justify plaintiff in not seeing.

Plaintiff was well aware of the condition of the crossing and the approaches thereto. She had driven over it daily for eight years. If the conditions distracted her attention from the approaching train, it did not prevent her from looking up the track. She testified she looked after starting up. This was between the time she stopped alongside the signal bell, and the time she collided with the train. However, because the track ran diagonally she could see only about 100 feet to the southeast.

Having been fully aware of the conditions confronting her in driving over this crossing, if the road was such that it interfered with the opportunity of looking while the car

was in motion, plaintiff could have stopped her car closer to the track where visibility would have been better and road conditions much less important.

A careful reading of plaintiff's testimony forces the conclusion that, because the signal bell was not ringing and the road was rough, plaintiff failed to use her other faculties in a proper and adequate manner. If she did look to the southeast she did so in a casual, inattentive and unconcerned manner. The failure of the signal bell was an invitation to her to proceed with due care, but was not an invitation to proceed without regard to other dangerous conditions then existing that could have been ascertained by the use of ordinary care.

Counsel for both parties have cited many cases touching the points raised in their briefs and in this opinion. No good purpose would be served by citing them in this opinion since they guide only insofar as their facts are similar.

As the prevailing opinion in the *Pippy* case so aptly states:

"* * * While prior decisions of this court show that we, in denying recovery in railway crossing cases on the ground of contributory negligence, have gone about as far as most cases in other jurisdictions, and farther than some, yet, in the main, we have adhered to the general rule that to a large extent each case is dependent upon and governed by its own facts, and whatever language or statements may be used or made in the cases must be considered with respect to and in view of the particular facts of the case * * *."

So, here the facts peculiar to this case lead to the inescapable conclusion that plaintiff's own acts and conduct were not in keeping with the care required █ of a traveller upon the highway about to go upon and across the tracks of a railroad. Had this plaintiff exercised such care, then the collision would have been avoided.

Plaintiff in her original complaint alleged she was the owner of the car damaged in the collision. During the course of the trial it appeared that her husband was the owner. The trial judge permitted an amendment to show the true facts relative to ownership of the car, and that the husband had assigned his right of action to the plaintiff. The dif-

ference, if any, in the rights of the plaintiff to recover for her personal injuries, and the rights arising by virtue of the assignment of the property damage action from her husband is not treated in this opinion.

No claim was made by plaintiff, in the trial court, that a different rule of law might be involved because she was not the owner of the car at the time of the accident. The trial court's attention was not directed to the ■ fact that she might have occupied the status of a bailee, nor was this question raised on appeal. Ordinarily, this court will not review matters which have never been raised, either at the trial or on appeal.

The judgment is affirmed.

McDONOUGH, C. J., and PRATT, WADE, and WOLFE, JJ., concur.